Filed 1/11/19

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C086016 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2014-0008187) |
| v. | |
| ANDY HEM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, George J. Abdallah, Judge. Reversed.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Henry J. Valle, Deputy Attorney General, for Plaintiff and Respondent.

1

On the night of October 11, 2014, defendant Andy Hem fatally shot his brother, victim Sokorng "Sok" Hem. The People argued the shooting was first degree murder; defendant claimed justifiable self-defense. The jury found defendant guilty of voluntary manslaughter and discharging a firearm in a grossly negligent manner (Pen. Code, §§ 192, subd. (a), 246.3) and found that he personally used a firearm (*id*., § 12022.5, subd. (a)). The trial court sentenced defendant to prison for 16 years. Defendant timely filed this appeal. On appeal defendant contends the prosecutor misstated the law in closing argument, the court improperly excluded evidence, the court failed to conduct an adequate (or any) inquiry into a claim of jury misconduct, and he is entitled to a sentencing remand under Senate Bill No. 620 (2017-2018 Reg. Sess.), effective January 1, 2018, which gives trial courts new discretion to strike certain enhancements.

We agree that the trial court did not adequately address jury misconduct. As a matter of law, this raises a presumption of prejudice. The jury deliberations were difficult, as reflected by pointed written questions submitted by the jury, a reported deadlock, and what seems to have been a compromise verdict. In these circumstances, we cannot find that the presumption of prejudice was dispelled by the record and we must reverse the judgment. This makes it unnecessary to address defendant's other claims of error which pertain to circumstances that might not recur in the event of a retrial.

## BACKGROUND

A detailed recitation of the trial evidence is not necessary to resolve this appeal. There was no dispute that both defendant and his brother were armed, there was an argument, and defendant shot and killed his brother.[1]

---

[1] The parties stipulated the victim was a member of a criminal street gang associated with "other Crip gangs." But there was no claim that this incident was a gang-related-- rather than purely familial--dispute. On appeal the parties agree the jury found imperfect self-defense, i.e., that defendant actually but unreasonably believed his life was in danger. We express no view on this supposition.

The prosecutor argued defendant shot at his brother multiple times (at first from behind), threatened a witness, disposed of the weapon, had fired a gun with gross negligence earlier that night, and had threatened his brother with a firearm on a prior occasion. Defense counsel emphasized an unusual and dangerous weapon found in the victim's waistband, a MAC-11 (Uzi-type) firearm with an extended magazine that had alarmed the peace officer who found it. Counsel argued the nature of this weapon caused defendant to fear his brother and therefore the killing was justified. The forensic evidence was not clear that the victim was shot from behind and it was not certain who had fired shots earlier that evening. There was evidence suggesting both men were very drunk.

On the morning of May 18, 2017, the attorneys completed their closing arguments and the jurors began deliberations. In a note time-marked 11:32 a.m., the jury asked about when the victim's blood had been drawn and which finger was fractured. In a written response at noon, the court referred the jury to a stipulation about the victim's blood-alcohol level and a readback was provided to answer the second question. In a note time-marked 3:20 p.m., the jury asked to review a particular witness's statement, and that testimony was re-read.

The next morning, Friday May 19, 2017, the jury (as had been arranged) began deliberations without the court formally reconvening. In a 11:30 a.m. note, the jury asked, "If you believe its 2nd degree murder does that mean its automatic man-slaughter?" The court and parties discussed the question in chambers. The written response given was "No" and the jury was referred to pattern instructions on murder and voluntary manslaughter and the instruction on how to deliberate, that is, in part that "You may consider these different kinds of homicide in whatever order you wish."

In a note time-marked 1:35 p.m., the jury checked a box stating: "We have agreed upon a verdict," but also wrote in "We cannot reach a further agreement." The court and parties discussed the matter in chambers and at 2:12 p.m., returned on the record outside

3

the presence of the jury. Before discussing the jury's note, the court asked defense counsel to summarize an issue that had been discussed in chambers. Defense counsel described the problem as follows:

> "At 1:17 in the afternoon I received a text from Elvira Lua, another co-worker of mine who is an attorney here in San Joaquin County. She asked me to come over, that there was a juror issue that needed to be discussed. She said while she was waiting to start her own jury trial, she was in the hallway and overheard three -- initially three, then four members of our jury, she described one of them as a tall black male, and then she described another one, the three left as white males, one of them a bald male, the other one a tall white male, and she couldn't describe the third white male.

> "She said that they were discussing the case outside of the presence of all of the jurors and outside the jury deliberation room. She heard them talk about a second, they talked about how there was one holdout on the second. They mentioned unconscious, they said that they were worried about letting him out so he could kill someone else's kid, but that they could otherwise live with the manslaughter if the answer from the court is yes. That was an answer I believe to the previous note they sent in regarding whether it was automatically a manslaughter if -- I believe the note was if it's a second degree murder, is it automatically manslaughter. So that's the information I received."

When the prosecutor explained that this differed from a version defense counsel had described earlier in chambers, defense counsel clarified as follows:

> "Your Honor, my information, I asked Ms. Lua to write it down immediately so that her memory could be preserved, and so I actually was reading from a text message she sent me. Anyways, based on this, I do believe it is jury misconduct. I believe that they were instructed to deliberate inside the presence of the jury room, also with all members present. Based on this, we are asking to move the court for a mistrial on this case."

The prosecutor argued a mistrial was premature because "we haven't had the jury out here yet to actually, one, get to the bottom of what the question -- what the jury's note was, and two, we haven't addressed the question of whether it's necessary for the court to voir dire the jurors at issue." After a brief discussion about the timing of the purported misconduct and the jury's note, defense counsel stated those jurors could have been

4

influencing each other "in a smaller setting" and in response to the prosecutor's suggestion that perhaps the jurors had not even returned from lunch at the time of the discussion, defense counsel argued: "If we do need answers, then I think we should probably talk to the jurors about that issue." In response to the court's question why an admonition would not be sufficient, defense counsel replied: "Because this was only a snippet of what we heard. They are clearly violating the rules of engagement that the court gave them. I don't know how far this went." The prosecutor, in response to the court's question, accepted as accurate Ms. Lua's account of what she had overheard.

After a brief recess, the trial court stated this "is the type of misconduct which could be cured by admonition" and denied a mistrial.[2] The parties then discussed how to proceed regarding the jury's apparent partial deadlock. The jury was instructed about possible ways to deliberate in order to reach an agreement, using a pattern instruction. (CALCRIM No. 3551.)

The court then admonished the jury about the need to deliberate as a group: "Also, ladies and gentlemen, I want to remind you, you cannot discuss the case with anyone, including fellow jurors, except when all of you are together in the jury deliberation room. That means even if one of your number wishes to use one of the restrooms provided in the jury room, then you must stop your deliberations until all twelve are together again. Please keep my admonishment in mind."

After some issues about schedules of particular jurors were discussed, the court was adjourned until the following Tuesday afternoon at 1:30.

That day, May 23, 2017, the jury again went directly to deliberations as had been arranged. Defense counsel placed on the record that she had reviewed the *Weatherton* case the court had cited and said: "I'm asking the court to reconsider my motion for an inquiry into the jury, into these allegations of misconduct, because we conflated, remedy,

---

[2] In part the trial court cited *People v. Weatherton* (2014) 59 Cal.4th 589.

5

I believe, with investigation, and the problem at hand here, Your Honor, is the remedy the court chose was to do a general admonition. However, they hadn't done the proper inquiry to determine whether or not that remedy would actually alleviate any bias. Under [*Weatherton*], it seems like the court concluded, once these issues have come to light, there is a presumption, with jury misconduct, that Mr. Hem has been prejudiced and then the burden shifts to the prosecution to prove that the bias -- that there is no bias. [¶] Because there was no inquiry into whether or not there was jury misconduct, I believe that the court jumped to the remedy section prematurely." "In this case, if they personally did something wrong, they personally needed to be told that they needed to stop." The fact the jurors were given the same admonition they had already violated was not sufficient. Further, "I think that why more investigation is also needed is because it's become apparent that from what [one] juror said, *he is taking into consideration punishment* by saying words to the effect that he could settle on a voluntary manslaughter but he worried that Mr. Hem would get out and kill someone else's kid."[3] (Italics added.) Defense counsel argued that "to determine what remedy, if any, is going to cure this misconduct, an inquiry should be made into how deep this misconduct runs."

The prosecutor stated that because she accepted the recitation of what had happened there was no need for any further inquiry.

The court stated it accepted Ms. Lua's account as that of an officer of the court with "the highest integrity," but reiterated that the admonition it had given was sufficient to address the matter, particularly because "the court has no evidence" that the misconduct had been repeated.

---

[3] The Attorney General's suggestion that *appellate* counsel first raised the issue of the jury's possible consideration of punishment is refuted by this passage.

During this time, the jurors had been deliberating. In a 2:35 p.m. note, the jury stated it "cannot reach a further agreement." The jury was called in and the foreperson stated no verdicts had been reached but thought that further argument from the attorneys might be helpful; the jury was sent back to put its concerns in writing.

Four written responses, each time-marked 3:23 p.m., were as follows (though it is not clear in what order they were presented to the court):

> "Does 2nd degree murder also encompass manslaughter? For example, if jurors feel 2nd degree murder fits, are they also assuming manslaughter fits?"

> "Count 2 and Count 3. Can we as a jury come to a verdict, even when we are indecisive on Count 1?"[4]

> "Referring to CALCRIM 520, can you present evidence or an [argument] that at the time he acted, he knew his act was dangerous to human life?"

> "Can we hear additional arguments both for and against Count 1 'Voluntary Manslaughter?' "

A note from the court marked 3:45 p.m. stated: "Please clarify your question. Especially the words 'fits' and 'encompass.' "

The jury responded with two notes at 4:00 p.m., one stating:

> "If certain jurors feel the criteria for 2nd degree murder were met, but the entire jury cannot agree on 2nd degree, of those jurors that feel 2nd degree was proved, do they also agree manslaughter was met?"

The second note referenced the instruction on the order of deliberations and in part asked, "If we work the order from voluntary manslaughter to 2nd degree murder and a decision [cannot] be made at 2nd degree do we default back to voluntary manslaughter as a unanimous decision?"

---

**4** Count 2 was grossly negligent discharge of a firearm that night; count 3 was assault with a firearm allegedly occurring on a prior occasion.

The jury was called back in and advised that the attorneys would be prepared to argue further the next morning in response to the jury's concerns. In part the court repeated: "Please keep in mind, again, you cannot deliberate among yourselves unless you are all together, all twelve, in the jury deliberation room and nowhere else, ladies and gentlemen. Please keep that in mind."

The next morning, May 24, 2017, the court answered the jury's question about reaching a verdict on counts 2 and 3 even if it was "indecisive" on the murder charge and said the answer was yes; further, the jury was told that new verdict forms had been prepared and would be made available to the jury.

The prosecutor then argued the differences between second degree murder and voluntary manslaughter, emphasizing the jury was free to structure the order of its deliberations however it wanted to, but that there was no "default" as had been referenced in one of the jury's written questions; any decision had to be unanimous. The prosecutor used a "murder plus" argument, explaining that if the jury otherwise found murder, but decided there had been something else, like adequate provocation or an honest but unreasonable belief in the need for self-defense, that would reduce the crime from murder to manslaughter.

The court then recessed for lunch, returning at 1:35 p.m. for defense counsel's additional argument. Defense counsel argued that the jury's various questions indicated it had already found voluntary manslaughter, and she urged the jury to stop there; she also characterized it as a "murder minus" case, where manslaughter was shown but the mens rea for murder was lacking, and she emphasized the People had the burden of proof on the relevant issues. "You can consider this in any order, but from your notes it sounds to me like all of you have agreed on a decision. If you feel like it's voluntary manslaughter, then that is your vote, that is your decision, and you can feel comfortable with that."

8

It is not clear how long the jury deliberated after the additional arguments, but the jury reached its verdict at 3:35 p.m., acquitting defendant of first and second degree murder, finding him guilty of voluntary manslaughter, and finding he personally used a firearm; the jury also found defendant guilty of grossly negligent discharge of a firearm, but acquitted him of the assault with a firearm charge based on an alleged prior incident between the brothers.

## DISCUSSION

Defendant contends the trial court should have inquired of the jurors to determine the scope of the misconduct (at a minimum, deliberation by a subset of jurors) and because the scope of the misconduct is not known the People cannot dispel the presumption of prejudice that arises when jurors violate their oaths. We agree.

### I

### *An Inquiry was Required*

The parties agree that the trial court properly accepted as accurate Ms. Lua's account, one that was not contested by either party. But Lua did not hear the entirety of the offending conversation. What she did hear suggested much more than a passing comment concerning deliberations. Therefore, as defense counsel urged, an inquiry was necessary to find out exactly how far the transgressions extended.

The Attorney General posits that *any* inquiry would have intruded on the "sanctity of the deliberative process."[5] Although we agree the jury's deliberative process must be

---

[5] Generally, " 'Evidence of a juror's mental process—how the juror reached a particular verdict, the effect of evidence or argument on the juror's decisionmaking—is inadmissible.' [Citations.]" (*In re Manriquez* (2018) 5 Cal.5th 785, 799; see *In re Hamilton* (1999) 20 Cal.4th 273, 294; Evid. Code, § 1150, subd. (a).) The inquiry is usually limited to a so-called "overt" event impacting one or more jurors and how likely it was that that event tainted the jury process. "When the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors . . . the event is called juror misconduct. [Citations.]" (*Hamilton,* at p. 294.)

protected, that general rule does not help the Attorney General in this case. As our Supreme Court has explained, "the secrecy of deliberations 'may give way to reasonable inquiry by the court when it receives an allegation that a deliberating juror has committed misconduct.' [Citation.] Even then, however, trial courts 'must exercise care in responding to an allegation from a deliberating jury that one of their number is refusing to follow the court's instructions or is refusing to deliberate' or is engaging in any form of juror misconduct. [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 569; see *People v. Engelman* (2002) 28 Cal.4th 436, 442-444 [the need to respect secrecy of deliberations does not preclude inquiry to determine jury misconduct]; *People v. Keenan* (1988) 46 Cal.3d 478, 533 [any inquiry "must be conducted with care so as to minimize pressure on legitimate minority jurors"].) Here, "care" could (and should) have been exercised by the trial court when it conducted an adequate inquiry into why four jurors were not following their oaths regarding how to deliberate, and to insure no improper consideration of punishment was being given. (See *Engelman*, at p. 442 [in non-capital cases "it is settled that punishment should not enter into the jury's deliberations"].) But the court instead conducted *no inquiry at all*, which was not adequate.

The trial court already knew a full third of the jury had--in violation of their oath-- discussed the case by themselves, and further knew that one or more had expressed worry about "letting [defendant] out so he could kill someone else's kid" and that one or more had been willing to settle on manslaughter, which defense counsel partly (and plausibly) construed as improper consideration of punishment. It was quite likely, not just theoretically possible, that at least these four jurors were discussing what amounted to a compromise verdict in order to assuage a holdout's concerns. This demanded an inquiry- -albeit a careful one, respecting the jurors' deliberative processes.

The Attorney General argues that defense counsel wanted to engage in a "fishing expedition," relying on authority that provides as follows:

10

"[I]t is within the discretion of a trial court to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. This does not mean, however, that a trial court must hold an evidentiary hearing in every instance of alleged jury misconduct. The hearing should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.)

In this case the defense *had* "come forward with evidence" that misconduct had occurred and that evidence *was not disputed*. Although *Hedgecock* also cautioned that a hearing was not necessary absent a "material conflict" that otherwise could not be resolved, in this case what was unknown was the *extent* of the misconduct. Exploring that question would not have been a "fishing expedition," but would have been a necessary step to preserve defendant's right to a fair jury trial.

In this connection, defendant relies on *People v. McNeal* (1979) 90 Cal.App.3d 830 and subsequent cases discussing *McNeal*.

In *McNeal*, information came to light that one juror might have personal knowledge about the case. But when the court questioned that juror, it specifically precluded her from discussing any factual issues, and only ascertained that she thought she could put aside any information about the case that she had. (See *People v. McNeal*, *supra*, 90 Cal.App.3d at pp. 835-836.) *McNeal* held the court's inquiry was inadequate because it never established whether the juror *had* personal knowledge about the case, which could have provided good cause to discharge her. (See *id.* at pp. 836-838.) *McNeal* pointed out that "[i]t was also necessary for the court to determine whether other jurors had become aware of any statements by [the juror in question], and if so, whether their impartiality would be influenced thereby. Once a court is put on notice of the possibility that improper or external influences are being brought to bear on a juror, it is the court's duty to make whatever inquiry is reasonably necessary to determine if the

11

juror should be discharged and *whether the impartiality of other jurors has been affected.*" (*Id*. at p. 839, italics added.) *McNeal* declined to find the error harmless, given that the reason the record did not answer whether the juror should have been excused was because of the trial court's improperly curtailed inquiry. (*Id*. at p. 840.)

Although--as the Attorney General emphasizes--*McNeal* referenced a statute requiring a hearing when a juror may have personal knowledge (Pen. Code, § 1120), its reasoning was extended by our Supreme Court in *People v. Burgener* (1986) 41 Cal.3d 505.[6] In *Burgener* there was a report that a juror may have been intoxicated during the trial, possibly on drugs. (*Id*. at pp. 516-517.) *Burgener* held that *regardless* of the statute discussed in *McNeal,* "an inquiry sufficient to determine the facts is required *whenever* the court is put on notice that good cause to discharge a juror *may* exist." (*Id*. at p. 519, italics added; see *People v. Adcox* (1988) 47 Cal.3d 207, 253.) *Burgener* found the error harmless for lack of proof that the juror had been intoxicated, which the court ascribed to the defense attorney's act of urging the trial court *not* to conduct an inquiry--an application of invited error although not characterized as such--and therefore the defendant's remedy, if any, lay in habeas corpus where the necessary facts could be ascertained. (*Burgener*, at pp. 521-522.) In this case defense counsel repeatedly and correctly pressed the court to conduct an inquiry to make the necessary record.

In *People v. Chavez* (1991) 231 Cal.App.3d 1471, the trial court failed to conduct an inquiry after being presented with information that a juror had spoken to a police officer witness in the courthouse hallway. In contrast to this case, there the prosecutor and the defense attorneys did *not* believe the discussion involved the trial. (*Id*. at p. 1479.) Based on *McNeal* and *Burgener*, *Chavez* held the trial court in that case "was required to hold a hearing to determine whether the juror remained competent to serve.

---

[6] *Burgener* was disapproved on another point by *People v. Reyes* (1998) 19 Cal.4th 743.

The fact that the juror was seen speaking with a police officer who had been a witness in the trial constituted evidence that the juror may have been subject to improper or external influences. Failure to hold such a hearing was an abuse of discretion and constituted error." (*Id*. at p. 1482.) But *Chavez* also held that although a presumption of prejudice arises when a juror violates his oath, because there was no indication the conversation had anything to do with the trial, no such presumption arose. (*Id*. at pp. 1484-1485.) Similar to the procedural situation in *Burgener*, in *Chavez* counsel did not press the court for an inquiry, because all counsel apparently agreed that the improper discussion with the witness did not involve the trial. Here, again, defense counsel did not agree that what was already known about the jury misconduct was the full extent of that misconduct.

In this case, unlike in *Chavez*, the record affirmatively shows that a group of jurors had been discussing the case; that was a violation of their oath, which triggers a presumption of prejudice. (See *People v. Cooper* (1991) 53 Cal.3d 771, 835-836 ["When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties. [Citation.] The presumption of prejudice is appropriate in those situations"]; *In re Hitchings* (1993) 6 Cal.4th 97, 118.)

Generally, it is more serious misconduct for a juror to discuss information extrinsic to the case (e.g., talking to a testifying witness or a friend about the alleged facts) than to discuss intrinsic information (e.g., pointing out the defendant did not testify, something the other jurors would have noticed). (See *People v. Lavender* (2014) 60 Cal.4th 679, 692, fn. 2; *Raley v. Ylst* (9th Cir. 2006) 470 F.3d 792, 803 ["Although the jury's discussion of this issue clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it"].) But in either case there is a presumption of prejudice from misconduct.

Here, it is not clear from the record we have whether any of the jurors did anything that would have disqualified them from further service. But the point is a more complete record should have been made; as we have explained, further inquiry was

13

needed.  Like in *McNeal* and unlike in *Burgener*, defense counsel in this case pressed the trial court to ascertain exactly how far the misconduct extended, but the court refused to inquire.  That did not satisfy the court's duty to ensure the deliberations were proceeding properly, to preserve defendant's fundamental right to a fair jury determination of the question of his guilt or innocence.

## II

### *The Presumption of Prejudice*

The Attorney General argues the record does not show a "substantial likelihood or reasonable probability of prejudice [sufficient] to warrant reversal."  But as a matter of settled law, defendant established a *presumption* of prejudice.  (See *In re Hitchings*, *supra*, 6 Cal.4th at p. 118; *People v. Cooper*, *supra*, 53 Cal.3d at pp. 835-836.)  The Attorney General's "formulation has it backward.  Once a court determines a juror has engaged in misconduct, a defendant is presumed to have suffered prejudice.  [Citation.]  It is for the *prosecutor* to rebut the presumption." (*People v. Weatherton*, *supra*, 59 Cal.4th at p. 600.)

Jury misconduct "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct.  [Citations.]" (*People v. Lavender*, *supra,* 60 Cal.4th at p. 687 [discussing defendant's decision not to testify triggered a presumption of prejudice].)  In part *Lavender* explained that generally a reminder to the jury of its duties (in that case, not to consider a defendant's decision not to testify) is "strong evidence that prejudice does not exist." (*Ibid*.)  But the problem here (unlike in *Lavender* and other similar cases) is that we do not know how far the misconduct extended, and perforce cannot know whether the admonition about deliberating together--a repeat of the earlier instruction that had already been disregarded by a third of the jury--addressed all of the misconduct the errant jurors

14

had been committing.  (Cf. *id*. at p. 692 ["a persistent refusal to follow the court's instructions would tend to confirm the prejudicial effect of the misconduct"].)

The Attorney General primarily relies on the rule that we must presume jurors follow instructions and obey admonitions.  That is indeed the normal presumption applied on appeal.  (See *People v. Vang* (2009) 171 Cal.App.4th 1120, 1129; *People v. Zack* (1986) 184 Cal.App.3d 409, 416.)  But that presumption was already dispelled by the fact that four jurors were violating their instruction not to discuss the case without all jurors being present.

In the context of discussing defendant's claim of prosecutorial misconduct, the Attorney General in part argued as follows:  "The record shows that 11 jurors were on [the] verge of convicting appellant of second degree murder [citation], showing that almost all jurors rejected appellant's self-defense claim.  One juror apparently wanted manslaughter, presumably on grounds that appellant acted in imperfect self-defense. [Citation.]  The fact that the jury eventually decided on the lesser offense, against the opinion of 11 jurors, showed that the prosecutor's comments had no negative effect on the jury's ultimate decision."  This reasoning is substantially reiterated in the Attorney General's claim the jury misconduct did not cause prejudice.

But as defendant points out, in the context of prejudice, a mistrial is a better outcome than a conviction.  (See *People v. Reardon* (2018) 26 Cal.App.5th 727, 738, fn. 8; *People v. Soojian* (2010) 190 Cal.App.4th 491, 518-521.)  If the jurors were indeed deadlocked and a bloc of jurors acted outside the appropriate confines of the jury deliberation room to try to broker a resolution resulting in *any* conviction, that would tend to confirm, not to dispel, prejudice.  As defendant suggests, referencing what these four jurors were overheard saying, on this record it is quite possible "the 11 jurors improperly changed their votes because 'they were worried about letting [appellant] out so he could kill someone else's kid.'  [Citation.]"

For all the above reasons, on this record the People have not carried their burden to dispel the presumption of prejudice from jury misconduct.

## DISPOSITION

The judgment is reversed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Butz, Acting P. J.

_____/s/_____
Mauro, J.

16