Filed 11/8/22 P. v. Wade CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C094386 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF201016) |
| v. | |
| MARVIN WADE, JR., | |
| Defendant and Appellant. | |

In the spring of 2020, a mother and her 14-year-old daughter (Doe) began living with defendant Marvin Wade, Jr. One night, defendant had sex with Doe. At trial a factual dispute was whether defendant physically *forced* Doe to have sex with him that night. To support his trial theory, defendant argued he and Doe had *consensual* sex a *second* time the following day at a lakeside park after he took Doe to get her nails done. Doe denied a second sexual incident and insisted she did not accompany defendant to a lakeside park after going to a nail salon. The prosecution maintained there was no second

1

sexual incident. Defendant argued global positioning system (GPS) evidence from his ankle monitor corroborated his version of events at the lakeside park. The prosecution disagreed.

After defense counsel's closing argument to the jury, a juror sent a written note to the trial court, questioning why "[GPS] from the minor victim wasn't presented," as "[nowadays] almost every minor ha[s] a smart phone with them everywhere." The trial court did not disclose the contents of that note to the parties and did not respond in any way to the juror regarding that note. We agree with defendant that this was prejudicial error.

FACTUAL AND PROCEDURAL BACKGROUND

A few weeks after mother began dating defendant in the spring of 2020, she and her 14-year-old daughter Doe moved into an apartment where defendant lived with his grandparents. Mother and defendant slept on an air mattress in the living room, and Doe slept on a couch. Defendant's grandparents stayed in their bedroom "all the time," never interacting with mother and Doe. Defendant had occasional outbursts of anger, but "other than that," mother testified, "everything was great. We were going out, going to the lake, having fun every day."

A. *June 7, 2020*

On June 7, 2020, defendant, mother, and Doe went to a lake where mother testified she and defendant drank beer, and Doe had a sip "or two." Defendant testified they all drank alcohol and smoked marijuana at the lake that day. Doe testified she did not remember whether she consumed alcohol or marijuana that day. Upon returning to the apartment that evening, mother did not feel well and fell asleep on the air mattress in the living room around 8:30 p.m.

*Doe's Version*

As mother slept, Doe and defendant watched television on the couch for about an hour. Then defendant began rubbing the top of Doe's thigh. Doe was scared, having

2

watched "shows . . . of kids getting raped," and then killed. Defendant rubbed Doe's leg for about 30 minutes, and no one spoke. Then, with one hand, defendant grabbed Doe's arms and placed them behind her back and with the other hand, he pulled Doe onto her back and removed her pants.

Next, still holding Doe's arms and ignoring her request that he stop, defendant removed Doe's bathing suit bottoms that she had been wearing under her pants, put his head in between Doe's legs, and licked her vagina for about 15 minutes. Every time mother moved as she slept about one foot away, defendant stopped and "looked to see if she was waking up."

Defendant then released Doe's arms, removed his swim trunks, held Doe's arms behind her back again, and put his penis inside her vagina. Doe was "too in shock to move" when defendant briefly released her arms. Though scared, Doe "was holding [her]self back from crying. But after [defendant] stopped, [she] turned on [her] side and -- put [her] clothes back" on "and started crying."

On cross-examination, Doe said she did not try to wake her mother because she was in shock, and agreed that defendant did not threaten, hit, slap, or push her during the incident.

*Defendant's Version*

As mother slept, defendant and Doe drank alcohol and smoked marijuana. Later, when Doe was lying on the couch with her feet near defendant, she placed her feet on defendant's crotch, and put his hand on her breast. Defendant was "aroused," and "[i]t just advanced from there."

Doe never told defendant to stop, never pushed him away, and never called out to her mother. Defendant never threatened Doe or used any kind of physical force. Doe removed her clothes, performed oral sex on defendant, and then they had sex.

B. *June 8, 2020*

The next morning, defendant took Doe to a nail salon.

3

*Doe's Version*

Defendant took Doe to the nail salon to "keep [her] quiet from saying anything." When they were in the car outside the nail salon, Doe believed defendant when he told her he "would hurt" her if she "told anybody" what happened the night before.

On cross-examination, Doe denied drinking alcohol and having sex with defendant at a lakeside public park after getting her nails done, and insisted she did not remember going to the lake that day. After defense counsel played in open court a video of defendant's movements as recorded by a GPS tracker, Doe insisted that she remembered going to the nail shop, but not the lake. The video also refreshed her recollection that there was an entire day between the June 7 incident and the day when she and mother moved out of defendant's apartment on June 9.

*Defendant's Version*

That morning, mother told defendant she didn't feel like going out and was going to stay and rest. Doe agreed to go get something to eat with defendant rather than stay in the apartment with mother. After going to a coffee shop, defendant and Doe smoked marijuana in his car, and then they went to the nail salon. Defendant never threatened Doe not to disclose their sexual encounter the night before. He left money with Doe to pay for her nails, and then he went to a sporting goods store. Afterward, Doe and defendant went to get something to eat and brought the food back to the apartment, where mother ate half of a breakfast burrito and "laid back down."

Defendant and Doe "came up with a reason to leave together again." On Doe's suggestion, they drove to a lake at Sycamore Ranch as defendant smoked more marijuana. When they parked, they both drank alcohol, and Doe began masturbating in front of defendant. Defendant drove to a restroom area in the park, where they entered a public bathroom stall and "had sexual relations," for "[m]aybe 15 minutes." Next, they drove to Collins Lake to get ice cream and returned to the apartment. They told mother

4

they had been "out looking at cars." Mother said she was feeling a lot better and hungry, so they drove together to Old Sacramento to get something to eat.

Defendant explained he wore a GPS monitor that day, and with the assistance of a video exhibit, explained to the jury how his and Doe's movements that day were consistent with the data from his GPS monitor.

*Doe's Interview*

The jury watched a video of portions of a "specialized" police interview with Doe, wherein she describes, inter alia, what she did and where she went with defendant on June 8. That video is not in the appellate record, but a transcript of it — which the trial court apparently provided to the jury but did not admit into evidence — is.

C. *June 9, 2022*

The morning after Doe had her nails done, defendant attacked mother, and mother and Doe moved out of the apartment.

*Mother's Version*

Mother woke on the morning of June 9 planning to do laundry at a laundromat but before she could go to the bathroom, defendant yelled and threw things at her. Mother told defendant she was going to leave and defendant replied that she "wasn't going to go nowhere." Mother insisted she was leaving, so defendant "ripped the shirt off [her]" leaving marks on her chest and said, "[w]ell, you are not going anywhere with the clothes I bought you."

Mother tried to unlock the front door to leave, and defendant placed his hands on mother's neck, and choked her. Doe was crying and screaming for help when defendant's grandmother entered the living room. Defendant stopped choking mother and told his grandmother to go back to her bedroom.

Doe gathered their things, and when mother and Doe tried to leave, defendant blocked the door with the air mattress. Defendant argued with mother that she and Doe were "not going nowhere." Facilitating Doe's exit, mother lunged at defendant and

5

defendant hit mother on the back of her head with his fist. After mother escaped, she went to a neighbor's house where she found Doe, who appeared terrified. "Mom, he raped me," Doe said in front of the neighbor, who testified she heard the statement.

*Defendant's Version*

Defendant was angry with mother that morning because "[t]here was nothing for us to wear," and mother "was supposed to get up early that morning and do [the] laundry." During the argument, defendant told mother to move out, and he "snatched at the shirt she had on." The shirt had metal straps, which defendant claimed left the marks on mother's body.

Defendant did not block the doorway, try to stop mother or Doe from leaving, or strike mother. In fact, mother pushed him down when she lunged at him.

*Defendant's Grandmother*

Defendant's grandmother testified that when she went to the living room that morning to see what the screaming was about, Doe looked scared and told her, "he raped me."

D. *The Charges*

The Yuba County District Attorney's Office filed an information charging defendant with five offenses: forcible oral copulation upon a minor 14 years old or older (Pen. Code, § 287, subd. (c)(2)(C)—count I)[1]; forcible rape (§ 261, subd. (a)(2)— count II); dissuading a victim or witness (Doe) from reporting a crime (§ 136.1, subd. (b)(1)—count III); willfully injuring a cohabitant (mother) (§ 273.5, subd. (a)—count IV); and false imprisonment (of mother) by violence (§ 236, 237, subd. (b)—count V). The information also alleged defendant had a 2006 rape conviction that (1) was a prior serious felony for purposes of section 667, subdivision (a) and California's three strike

---

[1] Undesignated statutory references are to the Penal Code.

sentencing scheme, and (2) because Doe was a minor whom defendant forcibly raped, that conviction also exposed him to California's one strike sentencing scheme. (§§ 667.61, subds. (c), (d), (*l*) [one strike], 667, subds. (b)-(i) & 1170.12 [three strikes].)

E. *Prior Acts*

Before trial, defendant admitted his 2006 rape conviction. The jury heard testimony from a woman who explained that one night after she began dating defendant in 2005, when she was 17 years old and he was in his early 20's, defendant wanted to have sex, but she was sleeping and did not want to. Defendant hit her in the face at least 50 times with his fist. Later, the two had sex. "I didn't want to, but I was too scared not to," the woman testified. She did not try physically to prevent defendant from taking off her clothes or having sex with her.

In his trial testimony, defendant explained he first met the woman in a nightclub, and therefore believed she was over 21. After they had sex, he found out she was 17 years old. He was surprised, but the new information did not change their relationship. Defendant explained that — like his sexual encounter with Doe — his relationship with the 17 year old was the result of an already sexually active teenager "initiat[ing] it." Defendant insisted he did not force the woman to have sex with him.

The jury also heard from a woman who testified she dated defendant for six months in 2019. Defendant was emotionally abusive and hit her in the stomach and chest on several occasions, but he never sexually abused her.

F. *Jury Instructions*

Before the presentation of evidence, the trial court provided some preliminary instructions to the jury, including instructions on the presumption of innocence; the prosecution's burden to prove guilt beyond a reasonable doubt; and the jury's duty to consider only evidence presented at trial. After the close of evidence, and before closing arguments, the trial court instructed the jury. Among those instructions was the

admonition "to decide what happened based only on the evidence that ha[d] been presented to [the jurors] in th[e] trial."

G. *Closing Arguments*

Defense counsel argued Doe had a motive to lie. Counsel then sought to highlight "the holes of [Doe's] stories." Counsel noted discrepancies between Doe's recorded interview and her trial testimony and emphasized that GPS data corroborated defendant's testimony that he and Doe had sex after Doe got her nails done.

Counsel argued trial testimony was clear defendant "would take [mother] and [Doe] to the lake constantly. . . . Yet we are supposed to believe that the day after they have sex and [defendant] is shown going to the lake at Sycamore Ranch and Collins Lake, that suddenly [Doe] is not with him? He decides to just go by himself that one day?"

Counsel conceded that the law and public sentiment have deemed it wrong for defendant to have sex with Doe. "But that's not what you are here to judge," he told the jurors. "You are not here to judge whether he was wrong for having sex with a minor. He is not charged with that crime. He is charged with having forcible sex with someone."

In rebuttal argument, the prosecutor addressed defendant's reliance on GPS evidence: "You heard a lot about GPS monitoring in this case. I want to remind you that those GPS -- it was wrapped around his ankle, not [Doe's], to show where he was going, not where [Doe] was going. [¶] The [d]efense talked about how it showed the defendant and supposedly [Doe] going to a bathroom at Sycamore Ranch. . . . They had sex . . . for approximately 15 minutes . . . . I encourage you to look at those GPS coordinates. The GPS coordinates prove the defendant was only there for four minutes. . . . Not [enough time] to have sex . . . [for] 15 minutes." "Any of the sex that happened at Sycamore Ranch was not true."

8

After closing arguments, the trial court gave the jury a few more instructions, and explained: "If you need to communicate with me while you are deliberating, please send a note . . . . You should continue with your deliberations while you wait for my answer. I will answer any questions in writing or orally here in open court."

H. *Juror Questions*

The trial court received two written juror questions that are relevant here.

First, as defendant finished testifying, a juror asked: "What was the timestamp when arriving at the bathroom part of Sycamore Ranch and the timestamp when leaving? [¶] This way to get the amount of time spent at this portion of the day."

After an off-the-record conversation between the trial court and counsel, the trial court said: "In response to the jury's note[], as to the timestamps concerning the [d]efense evidence, Sycamore Ranch coming and going and where that day was spent, these exhibits are in evidence and you will be able to review them in the jury room should you choose. So you can go through all of this as much as you want."

We will refer to this note as "Juror Note 1."

Second, the moment defense counsel ended his closing argument, a courtroom bailiff announced there was a question from a juror. The trial court said: "Oh, we can't have -- I'll take your note, but the questioning process is only during testimony. . . . Maybe I can answer it later."

After the trial court gave final instructions to the jurors and released them for lunch before deliberating, the trial court addressed counsel: "I did get a note from a juror during argument. *I'm not going to share it with anybody.* I'm going to retain it because *that would show what the juror thought.* So I'm *actually going to destroy it.* We indicated questions could be asked when witnesses were on the witness stand. And I was pretty deliberate that you had to ask the question when the witness was testifying. It wasn't a question to be asked of counsel. I don't know what else to do with her note. Any idea?" (Italics added.)

9

The prosecutor asked the trial court to "mark it as an exhibit in case this comes back on appeal." Defense counsel replied, "I think that would be the proper thing to do." "Okay," the trial court said. "So what I'm going to do then is I'm going to hand it to the clerk, and mark it [c]ourt's next in order" (which was number seven). "[Seven] is sealed until further order of the [c]ourt so nobody can look at it . . . so nobody will know what the juror thought. . . . Okay. That's a good idea."

The note said: "Why the [GPS] from the minor victim wasn't presented? [¶] [Nowadays] almost every minor ha[s] a smart phone with them everywhere."

We will refer to this note as "Juror Note 2."

I. *Verdicts*

The jury found defendant guilty on counts I (forcible oral copulation upon a minor 14 years old or older), II (forcible rape), and IV (willfully injuring a cohabitant). As for count V, the jury acquitted defendant of false imprisonment by violence, but found him guilty on the lesser included charge of false imprisonment. On count III (dissuading a victim or witness), the jury was unable to reach a verdict, and the trial court declared a mistrial as to that count.

J. *Sentencing*

In May 2021, applying California's one strike sentencing laws, the trial court sentenced defendant to two consecutive terms of life without the possibility of parole (for the two sex offenses against Doe), consecutive to 18 years.

Defendant timely appealed.

DISCUSSION

I

Defendant argues the trial court violated his right to an impartial jury on the two sex counts "by failing to hold a hearing, or even alert defense counsel, after" Juror Note 2 "raised a strong possibility of juror misconduct." Defendant contends "[t]he very nature of the question" in Juror Note 2 "suggested that, when it came to the two sex counts, the

juror was already making significant assumptions about matters not in evidence . . . that [Doe] had a cell phone with her on June 8, 2020, and that the phone had GPS capability." In a related argument, defendant maintains the trial court also prejudicially erred by "failing to admonish jurors against speculating into matters not in evidence."

The People argue defendant's claim is forfeited on appeal because he did not "object to the juror's note or request its disclosure, nor . . . object to the trial court's decision to seal it." On the merits, the People contend the note did not constitute juror misconduct. It "only showed the juror's subjective reasoning and thoughts." The note "simply comments on certain evidence," and "shows the juror's thoughts regarding the accessibility of technology."

We conclude the People's forfeiture argument is unavailing because the trial court had an independent duty to ensure a fair jury determination on the question of defendant's guilt. We further conclude the trial court violated that duty by failing to disclose the contents of Juror Note 2 to counsel and failing to respond to the jury regarding Juror Note 2 by, for example, admonishing the jury not to speculate about facts not in evidence.

*Analysis*

" 'A jury's verdict in a criminal case must be based on the evidence presented at trial, not on extrinsic matters.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 829.) "When a trial court is aware of possible juror misconduct, the court 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255.)

The parties briefed this issue in terms of a trial court's independent duty to investigate and hold a hearing when there is "good cause" to doubt a juror's ability to perform his or her duties. (See *People v. Hayes*, *supra*, 21 Cal.4th at p. 1255; *People v. Ray* (1996) 13 Cal.4th 313, 343.) And while defendant's claim may have some merit under that rubric, we think the better analysis is through the lens of a trial court's

11

independent duty to "preserve [a] defendant's fundamental right to a fair jury determination of the question of his guilt or innocence." (*People v. Hem* (2019) 31 Cal.App.5th 218, 229 (*Hem*); cf. *id.* at pp. 220, 229-231 [reversing a voluntary manslaughter conviction because "a more complete record should have been made" regarding possible juror misconduct]; cf. *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 482-483 [it may be a "due process violation" if "a juror's receipt of information about the case that was not part of the evidence received at trial" undermines the juror's " 'capab[ility] and willing[ness] to decide the case solely on the evidence before it' "]; *People v. Burgener* (1986) 41 Cal.3d 505, 519-521 [explaining the basis in California law of a criminal defendant's "inviolate right to trial by jury" and the trial court's independent duty to safeguard the right].)[2]

Here, a key factual dispute regarding counts I and II was whether defendant *forced* himself on Doe. Defendant argued he had *consensual* sex with Doe *twice*: on June 7 (on the couch in the apartment) and on June 8 (in a public restroom by the lake). The prosecutor argued defendant raped Doe once, on June 7; and took her to a nail salon the next day to coerce her silence but did not have sex with her again. Both parties discussed the importance of GPS data bolstering (or undermining) the other side's version of events. Further, Juror Notes 1 and 2 indicate at least some jurors were keenly interested in what the GPS data showed. And Juror Note 2 indicated at least one juror may have been speculating about the existence of evidence — that had not been presented to the

---

[2] The parties discussed *Hem* in their briefs, and had an opportunity to brief this slightly different approach to the appeal that we take. (See *People v. Alice* (2007) 41 Cal.4th 668, 679 ["The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of section 68081"].)

jury[3] — going to the heart of this key factual dispute (suggesting a possibility that a juror was considering drawing an adverse inference *against* defendant in light of his failure to introduce evidence (Doe's phone's GPS coordinates throughout June 8, 2020) that, *if* it existed, would have supported defendant's version of events).

Given that context, the trial court failed to preserve defendant's fundamental right to a fair jury determination when it refused to reveal the contents of Juror Note 2 to the parties and failed to respond in any way to the juror who wrote Juror Note 2.

*People v. Elguera* (1992) 8 Cal.App.4th 1214 (*Elguera*), is instructive. There, the appellate court reversed a conviction because the trial court failed to meet its sua sponte duty to repeat an instruction that had been read to the jury before trial regarding the presumption of innocence and the prosecution's burden of proof beyond a reasonable doubt. (*Id*. at pp. 1216, 1219-1220.) The appellate court explained that, due to the trial court's error, "any intellectual awareness the jurors had that the reasonable doubt standard applied may not have been accompanied by the sense of centrality and importance the instruction should carry." (*Id.* at p. 1222.)

The appellate court queried: "Would any of the jurors have voted to acquit if" the trial court had properly discharged its sua sponte duty? "We simply cannot know," the court wrote. "Yet the nature of this case made it a reasonable possibility. Defendant's exculpatory version of events was neither physically impossible nor contradicted by any direct evidence. It probably raised *some* doubt in the jurors' minds; the essence of their task was then to decide if those doubts were reasonable, i.e., to assess as closely as

---

[3] The transcript of Doe's police interview includes an indication by Doe that she had a phone with her on the morning of June 8, 2020. But that comment does not indicate whether (1) Doe had a phone with her later that day when — according to defendant — after returning to defendant's apartment, defendant and Doe left the apartment a second time and had sex near the lake at Sycamore Ranch or (2) Doe's phone had functioning GPS capabilities that day.

possible the strength of the prosecution's circumstantial case. It is at this delicate stage in deliberations that the precise meaning of 'reasonable doubt' is likely to become important to a jury. The possibility cannot be excluded that lack of a definition contributed to the verdict." (*Elguera*, *supra*, 8 Cal.App.4th at pp. 1223-1224; see *id*. at pp. 1220-1221 [applying the harmless error standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24].)

Likewise, here, defendant's version of events was not impossible, and as evidenced by Juror Notes 1 and 2, apparently raised some doubt in at least some jurors' minds. Juror Notes 1 and 2 indicated some jurors appeared to agree with the parties' closing arguments that GPS evidence, or lack thereof, was important in determining defendant's guilt or innocence on counts I and II. But the trial court did not disclose the content of Juror Note 2 to the parties, thereby hindering their ability to advocate to the jury.

And the trial court did not follow up with the juror who wrote Juror Note 2 (by, for example, reinstructing the juror, or the entire jury, to decide what happened based only on the evidence presented at trial), thereby leaving unanswered an important question that suggested juror consideration of facts not in evidence. (Cf. *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [because a trial court "has a primary duty to help the jury understand the legal principles it is asked to apply," when the jury requests information during deliberations, a trial court "must do more than figuratively throw up its hands"; it "should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given"].)

*Before* the receipt of Juror Note 2, the trial court instructed the jury to decide what happened based only on the evidence presented. But "any intellectual awareness the jurors had" to consider only evidence presented at trial (and not speculate about the existence of GPS evidence that was not presented) "may not have been accompanied by the sense of centrality and importance the instruction should [have] carr[ied]." (*Elguera*,

14

*supra*, 8 Cal.App.4th at p. 1222; cf. *Hem*, *supra*, 31 Cal.App.5th at p. 230 ["the normal presumption" on appeal that jurors "follow instructions and obey admonitions" is "dispelled" when there is evidence jurors "were violating" an instruction].)

Accordingly, the trial court erred by failing to disclose the contents of Juror Note 2 to counsel and failing to respond to the jury regarding Juror Note 2.

## II

Like *Elguera*, we apply *Chapman* harmless error review to determine whether the trial court's error was prejudicial. And as in that case, we conclude the possibility cannot be excluded that the trial court's error contributed to the verdicts on counts I and II. This is so because it is apparent at least one juror was concerned about what the GPS evidence, or lack thereof, proved vis-à-vis the parties' differing versions of events, especially in light of the jury's inability to reach a verdict on count III (dissuading Doe from reporting his crime against her). We conclude that had the trial court not erred, it is plausible at least one juror might have reached a different conclusion on counts I and II.[4] "[I]n the context of prejudice, a mistrial is a better outcome than a conviction." (*Hem*, *supra*, 31 Cal.App.5th at p. 230.)

---

[4] The People argue any error was harmless "in light of the evidence presented at trial." This argument (provided in the context of "assuming" error by the trial court in failing to hold a hearing to investigate the possibility a juror was unable to perform their duty) is unpersuasive, because it misconstrues the applicable test. The strength of the evidence of defendant's guilt is immaterial. The question is whether there is a substantial likelihood a juror was actually biased against defendant, where actual bias is " 'a state of mind . . . in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality.' " (*In re Manriquez* (2018) 5 Cal.5th 785, 798-799; see *People v. Nesler* (1997) 16 Cal.4th 561, 579 ["If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict"].)

## DISPOSITION

The convictions on counts I and II are reversed. Upon issuance of the remittitur, the prosecution may retry those charges. When appropriate, the trial court shall resentence defendant and provide a copy of the new abstract of judgment to the Department of Corrections and Rehabilitation.


            /s/            
            BOULWARE EURIE, J.



We concur:



    /s/            
ROBIE, Acting P. J.



    /s/            
KRAUSE, J.

16