Filed 4/22/22  P. v. Bailey CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KEVIN BAILEY,<br><br>    Defendant and Appellant. | C087972<br><br>(Super. Ct. No. 15F03495) |

The six-year-old victim reported that defendant Kevin Bailey, her mother's boyfriend, touched her inappropriately.  At his first trial, defendant was charged with three counts of violation of Penal Code section 288, subdivision (b)(1) (statutory section citations that follow are to the Penal Code unless otherwise stated).  The acts charged were:  count one, "fingers to vagina in living room"; count two, "finger inside vagina in living room"; and count three, "grabbed her hand and made her rub his penis."  The jury

1

at defendant's first trial found him not guilty on count two and hung on counts one and three. At his second trial, defendant was charged with two counts, corresponding to counts one and three from the first trial. A jury found defendant guilty on both counts.

Prior to sentencing, defendant moved for a new trial based on three alleged instances of juror misconduct and moved for a continuance to investigate further. The trial court denied the motion for a continuance and denied the new trial motion without conducting an evidentiary hearing. The trial court sentenced defendant to the upper term of 10 years on each count.

On appeal, defendant asserts (1) double jeopardy and collateral estoppel barred retrial on count one, (2) the trial court erred in denying his motion for a continuance and in failing to conduct an evidentiary hearing into juror misconduct, (3) the trial court abused its discretion in sentencing him to upper term sentences because the court made unsupported findings as to aggravating factors, and (4) relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1175, the trial court violated his constitutional rights by imposing fines, fees, and assessments without conducting an ability-to-pay hearing.

After the matter was originally deemed submitted, we vacated submission and directed the parties to file supplemental briefs on the effect, if any, of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731) (Senate Bill 567) on defendant's appeal. The parties agree Senate Bill 567 applies retroactively to defendant's case, but the Attorney General asserts the "error" in failing to sentence him in accordance with the requirements implemented by that legislation is harmless beyond a reasonable doubt.

We shall remand for resentencing in compliance with Senate Bill 567. We otherwise affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

A second information, filed prior to the commencement of defendant's second trial, charged defendant in count one with violation of section 288, subdivision (b)(1),

2

lewd and lascivious act, "fingers to vagina in living room," on a child under the age of 14 by use of force, violence, duress, menace, and threat of great bodily harm. Count two charged defendant with violation of section 288, subdivision (b)(1), lewd and lascivious act, "grabbed her hand and made her rub his penis," on a child under the age of 14 by use of force, violence, duress, menace, and threat of great bodily harm. Both acts were alleged to have occurred on or about and between May 15, 2014, and January 19, 2015.

The Prosecution Evidence

Carolina was the cousin of the victim's father, Tony. Carolina also had been good friends with the victim's mother, Brittany, however, at some point, Carolina and Brittany became estranged and stopped talking. Brittany remained close with Carolina's mother and Carolina's sister, Diana. Carolina was close with the victim and was her babysitter. At some point, the victim's parents split up and later Carolina learned Brittany was dating defendant.

On January 19, 2015, as previously arranged with Diana, Brittany brought the victim to the house where Carolina lived with her mother. The victim played with Carolina's son, but she seemed quiet, "different than normal." Carolina told the victim that if there was anything wrong, the victim could talk to her. Eventually, the victim started crying. She told Carolina defendant had been touching her inappropriately. The victim said defendant touched her on her vagina, which she called her "cha-cha." She said that it hurt "down there," and said something about a rash or blood on toilet paper after she went to the bathroom. The victim also said defendant would make her touch his private parts in the shower, "and that water would come out in her hand." Carolina testified that the victim told her defendant would have her move her hand in a particular way, and demonstrated by cupping her hand and moving it up and down. Defendant also touched her butt. The victim said the touching happened more than once. The touching occurred in her room as well as in the bathroom. The victim said the touching had been

3

going on for 30 to 40 days. Defendant would touch her when her mother was not around. According to Carolina, the victim reported that she had tried to tell her mother, but her mother would not listen.

Carolina called Tony and told him what the victim had told her. Tony and his wife came to Carolina's house. According to both Tony and his wife, the victim was crying. The victim told Tony's wife that defendant touched her where she goes to the bathroom, underneath her underwear. The victim also showed her what it looked like when defendant touched her by making a rubbing motion with her fingers. Tony's wife asked the victim if defendant made her touch him anywhere, and the victim said he made her touch his penis. Carolina called the police, and then they went to Sutter Roseville Medical Center.

Detective David Neher of the Citrus Heights Police Department reported to Sutter Roseville Medical Center for a call involving the six-year-old victim. Neher took a statement from Carolina, Tony, Tony's wife, and Brittany. Neher characterized Brittany as argumentative. She refused to cooperate with Neher's request that she not divulge information to defendant, and she opined that "the story was fabricated." Neher proposed a pretext call and explained that such calls only work if the suspect is not aware that law enforcement is involved. However, Brittany indicated she was not going to withhold any secrets from defendant.

Called as a witness by the defense, Neher testified that, at first, Brittany was willing to participate in a pretext call. However, Neher's recording device failed. Thereafter, it was clear to Neher that Brittany was unsure if she would "be able to keep this matter confidential from her boyfriend." Generally, according to Neher, there is no point to a pretext call if a subject knows they are being investigated for child molestation.

Upon leaving the medical center, the victim was taken to the BEAR Clinic. Julie Langston, a registered nurse and clinical examiner at the clinic, performed a forensic exam on the six-year-old victim, including taking swabs from various parts of her body.

4

The victim complained of pain and discomfort in her genitals when she went to the bathroom.  She also said she had some genital bleeding, although not that day.  Langston testified the victim's complaints could be consistent with a sexual assault.  Langston did not find anything abnormal in examining the victim's genitals.  Langston's findings—that nothing appeared abnormal—were consistent with what she could expect to find based on the history she was given.  She explained that 90 percent of pediatric cases return "normal" results.  Where a child claims an adult touched her genitals, and she offers no particular time frame, Langston would not expect to find physical damage.  Langston reiterated that it is very common to have "absolutely normal findings."  She also testified that tissues in the genitals heal quite quickly and touching alone may not cause injuries.

Detective Michelle Drake arranged for the victim to have a SAFE interview with a forensic evaluator, monitored from another room by law enforcement and Child Protective Services.  A recording of the interview was played for the jury.  The interviewer asked the victim if she knew why she was there, and the victim responded that she was there because defendant kept touching her on the privates.  The victim said she had been coloring in her room, Brittany was in the shower, and defendant was in the living room.  Defendant called to the victim and, when she did not come, he pulled her off the bed and dragged her on her butt to the living room next to the couch.  He stood her up and told her to pull up her dress.  She asked why, and defendant responded, "who cares?  Just pull it up."  Then "he started doing it."  He reached under her panties with his hand and started "doing this" touching her "[p]ee-pee" "super hard on [her].  And it was hurting" her.  He was "doing it slow.  And then he went a little faster . . . ."  While he was doing it, he was telling her to be quiet.  The victim yelled for Brittany, but she did not respond.  Defendant covered the victim's mouth with his other hand.  At some point, she was able to get away.  When the victim used the bathroom, she saw some blood.  When she wiped, it hurt a little.  Then she ran to her room and locked the door.

The victim told the interviewer that, on another occasion, she was in her room when defendant came in, pulled down his shorts, told her to look, and she saw his penis. He grabbed her hand and made her touch his penis. She "had to do the same thing what he did to me," meaning "rubbing." The victim said defendant had been "about to pee on" her because she "saw some water" come from his penis. Defendant "almost peed all over" her. It "almost went on" her "[c]ouch bed thingy." The victim said she had to touch defendant's penis more than once. It happened in Brittany's room, in her own room, in the living room, in the kitchen, and in the bathroom. She estimated he touched her private part 10 times, including in the living room, the bathroom, her room, her mother's room, the kitchen, and outside by a wall or fence. He also touched her on her butt with a "scrubby thing" from the sink.

On January 29, 2015, Detective Drake went to Brittany's apartment and performed a consent search. She collected a Disney princess mini couch from the floor next to the bed in the victim's bedroom. She also collected a comforter, a flat sheet, and a fitted sheet from the victim's bedroom. She collected these items because "[t]hose were the items that [the victim] said that [defendant] possibly peed on." Drake also collected a buccal swab DNA sample from defendant.

Nikki Sewell, a criminalist who performed DNA analysis in this case, testified defendant was a potential contributor to two foreign alleles found in the umbilicus, or bellybutton, swab from the victim's sexual assault kit. That partial profile could be expected to occur at random in unrelated individuals in one in 13 instances in the African-American population, one in four in the Caucasian population, and one in four in the Hispanic population. Sewell took six cuttings from a Disney mini couch that folded out into a bed. One of those cuttings contained one sperm. In performing her analysis, she found a sperm fraction and a nonsperm fraction in extractions she took from the couch cutting. The DNA from the nonsperm fraction matched the victim's profile. The sperm fraction had a major contributor and a minor contributor. Defendant was included

6

as a potential contributor to the minor contributor profile. That partial profile was expected to occur at random among unrelated individuals in approximately one in 540 billion of the African-American population, one in three billion of the Caucasian population, and one in 75 billion of the Hispanic population. Sewell testified the amount of sperm on the couch coupled with the victim's profile on it could be consistent with "if the ejaculation occurred, got on [the victim's] hand and she touched the couch." It was also possible ejaculation occurred and splashed on the couch. Sewell also obtained samples from cuttings from a flat sheet and fitted sheet. She found sperm cells on both. According to Sewell, the absence of staining and other factors suggested the sheets had been laundered since the semen deposit. Sewell testified the samples she developed from the sheets matched defendant's profile. That profile was expected to occur at random among unrelated individuals in approximately one in two sextillion of the African-American population, one in one quintillion of the Caucasian population, and one in 16 quintillion of the Hispanic population.

After being informed of DNA testing results, Detective Drake arranged to interview defendant. A recording of the interview was played for the jury. Drake asked defendant where he and Brittany would have sex, and he responded they only had sex in the bedroom. Drake asked defendant where he would masturbate at home, and he responded he would masturbate in the bedroom he shared with Brittany. He stated the victim never saw him do it. Drake confronted defendant with the fact that his sperm had been detected on the victim's sheets and the Disney couch. Defendant said that nothing happened. He said that if he fought with Brittany, he might sleep in the victim's room while the victim slept with her mother. Defendant stated he did not do anything and had no idea how his sperm could have been found in the victim's bed and in her bellybutton.

The victim testified at defendant's second trial. She was 10 years old at the time. She testified that, when she lived with her mother and defendant, she referred to defendant as "Daddy Kevin" or her "second dad." She recalled a few years earlier she

7

told people that defendant touched her vagina and that he made her touch his penis. However, the victim testified that she lied to everyone when she told them defendant had touched her privates. She acknowledged that, at the first trial, she did not say she had lied. She testified that, in a meeting with the defense, she stated that she made up these lies because she wanted attention from her father. She repeatedly testified she did not know why she made the claims about defendant in the SAFE interview. She testified that all the things she described when she was six were a lie, and that she was telling the truth at the second trial.

Dr. Blake Carmichael, a clinical psychologist, testified that, if an abused child fears that the person to whom they disclose the abuse will react with sadness or anger, the child may not want to disclose. Carmichael also testified children may recant valid claims of abuse. They may do so to avoid negative consequences of disclosure or in response to family pressure. If a child discloses and then sees the pain disclosure caused, the child may be dissuaded from disclosing further. The "child typically is not going to want to have a person they care about endure even more pain and feel responsible for doing that." A child may conclude it is easier to say abuse did not happen rather than endure the negative consequences of disclosure. On cross-examination, Carmichael testified that false allegations of abuse made by children are rare. False allegations of abuse are more common in cases where child custody is involved, but it is usually a parent making the allegation.

*Defense Evidence*

Cari Caruso, a registered nurse and board-certified sexual assault nurse examiner, noted that, while the victim complained of bleeding, according to Langston's report, there was no indication of any source of bleeding. Caruso testified that Langston's examination findings—that nothing appeared abnormal—were equally consistent with nothing having happened.

8

Brittany testified she separated from Tony, the victim's father, in July 2011, when the victim was three years old. Brittany met defendant on Christmas, 2012, they began dating a few weeks later, and they began living together within "a couple months." On January 19, 2015, defendant was living with her. Brittany trusted defendant and she would let him babysit the victim, including when Brittany was at work.

On the night the victim was at the hospital, a police officer asked Brittany not to tell defendant anything about the accusations. Brittany felt she could not "just go home and pretend like everything was okay when [the victim] was not with me and I was wondering what was going on." She continued: "I had a lot of questions and I just—I was very confused and I could not hide that." She testified she did try to cooperate with the officer.

Brittany testified she and defendant had sex in the victim's room on occasion. The victim had a television in her room, so, sometimes, defendant and Brittany would relax on the bed and watch television. This would occur when the victim was not at home. She also testified that, on some of these occasions, the sex would end in defendant "pulling out." She testified they possibly had sex on the mini couch. On cross-examination, Brittany acknowledged that, in a prior discussion with Detective Drake, she indicated there would be no reason defendant's sperm DNA would be in the victim's room. She testified that, when she made those statements, she "didn't know that anything could stay on after it's been washed."

Brittany testified defendant had a very friendly and loving relationship with the victim. He took her to the park and enrolled her in ballet class because he knew she loved ballet. The victim seemed to really love defendant. The victim never expressed any fear of defendant. She also never told Brittany that defendant did anything bad to her or that he touched her inappropriately.

Brittany's sister Kimberly, her father, her stepmother, Diana, and defendant's father all testified about their observations of defendant's relationship with the victim.

9

They all testified defendant and the victim appeared to have a loving relationship, they appeared to enjoy spending time together, the victim never appeared to be afraid of defendant, and nothing they observed about the relationship gave them cause for concern.

Kimberly was at a meeting at Brittany's house with the victim and the defense. The meeting was audio recorded, and the recording was played for the jury. At the meeting, the victim agreed she felt defendant "never did anything inappropriate by touching" her. She stated defendant never touched her inappropriately, and that he never touched her private parts. She had happy memories of defendant, such as that he took her to the park, to the zoo, and kayaking. The victim also did not remember telling people that defendant had done something to her.

### *Verdict and Sentence*

The jury found defendant guilty on count one, violation of section 288, subdivision (b)(1), "lewd and lascivious act, (fingers to vagina in living room), by force or fear," and on count two, violation of section 288, subdivision (b)(1), "lewd and lascivious act, (grabbed her hand and made her rub his penis), by force or fear." The trial court sentenced defendant to an aggregate term of 20 years, consisting of the upper term of 10 years on each count.

### DISCUSSION

### I

### *Double Jeopardy and Collateral Estoppel*

At his first trial, defendant was charged in three counts. In count one, the amended information charged defendant with violation of section 288, subdivision (b)(1), lewd and lascivious act, "fingers to vagina in living room," on a child under the age of 14 by use of force, violence, duress, menace, and threat of great bodily harm. Count two charged defendant with violation of section 288, subdivision (b)(1), lewd and lascivious

10

act, "finger inside vagina in living room," on a child under the age of 14 by use of force, violence, duress, menace, and threat of great bodily harm. Count three charged defendant with violation of section 288, subdivision (b)(1), lewd and lascivious act, "grabbed her hand and made her rub his penis," on a child under the age of 14 by use of force, violence, duress, menace, and threat of great bodily harm. As with the counts charged at the second trial, all three acts were alleged to have occurred on or about and between May 15, 2014, and January 19, 2015. Thus, counts one and three in the first trial corresponded to counts one and two at the second trial.

With few exceptions, the witnesses who testified at defendant's first trial testified at his second trial. Unlike the second trial, at the first trial, the victim did not deny the alleged acts of sexual abuse happened, but rather testified, for the most part, that she did not remember anything.

Defendant acknowledges that, with the exception of the victim's change in testimony, the prosecution evidence at the two trials was largely the same "with some minor differences."

The victim, who was eight years old at the time of the first trial, initially testified defendant did things to her she did not like. She testified she had been drawing and then went to the living room. However, she then testified she did not remember what happened in the living room. Defendant was there, but she did not remember what happened next. She did not remember what defendant did to her. Asked if defendant touched "these places that you said people shouldn't touch," the victim testified, "I really don't remember." When the prosecutor asked the victim to say what she remembered, the victim testified, "I don't really remember anything right now." When asked if anyone touched the parts of her body that someone should not touch, the victim testified, "I don't know." She testified she did not remember what she talked about at her forensic interview. Asked if there were things she just did not want to remember, the victim testified, "I don't really remember anything." She did testify that she had seen a man's

11

penis. However, she testified she did not remember whose penis she saw. She did testify defendant was living in the house at that time. However, when the prosecutor asked if it was defendant's penis she saw, she testified that she did not remember.

In closing argument in the first trial, the prosecutor argued, among other things, that the six-year-old victim described sexual matter—the appearance of a penis, ejaculation, the act of stroking a penis with the hand, having one's vagina digitally penetrated—that someone of that age should not know. The reason the victim knew of these matters, the prosecutor argued, was because she experienced them because defendant molested her. The prosecutor advanced a similar argument in the second trial.

The jury at defendant's first trial found him not guilty on count two of violation of section 288, subdivision (b)(1), "a lewd and lascivious act (fingers inside vagina in living room), by force or fear . . . ." The jury was unable to reach a verdict as to counts one and three.

Defendant asserts the judgment on count one must be reversed because the prosecution improperly relitigated a theory precluded by defendant's acquittal on count two in the first trial. According to defendant, this violated the double jeopardy clause of the Fifth Amendment. Defendant asserts that, under *Ashe v. Swenson* (1970) 397 U.S. 436 (*Ashe*) and the doctrine of collateral estoppel, he could not be retried on count one because the jury in his first trial "had considered and rejected [the victim's] credibility as to the events on January 19, 2015." According to defendant, there "is no other way to explain the unanimous not guilty verdict other than the first jury reached a finding that [the victim] was not credible." Thus, according to defendant, he "could not be retried as to the alleged events on January 19, 2015, involving [the victim] because the first 'jury could [not] have grounded its [not guilty] verdict upon an issue other than' whether [the victim] was credible and telling the truth about the incidents that happened with [defendant] on that day."

"The general rule is that 'former jeopardy [must] be affirmatively pleaded, . . . or any claim on that ground is not preserved for review.' " (*People v. Gurule* (2002) 28 Cal.4th 557, 646; see §§ 1016, 1017.) "Courts long have observed, however, that 'a claim of double jeopardy is most appropriately raised by way of a pretrial motion to dismiss the accusatory pleading or portion thereof allegedly barred by double jeopardy.' " (*People v. Batts* (2003) 30 Cal.4th 660, 676.) Defendant neither entered an affirmative plea asserting a double jeopardy defense nor moved for dismissal on that ground. Having failed to raise the issue, defendant has forfeited the contention. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1185 [failure to raise double jeopardy and collateral estoppel in trial court results in forfeiture].) However, he raises the additional claim that, insofar as he forfeited the issue, he was denied the constitutionally effective assistance of counsel.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.)

Where the assertion of double jeopardy would have been meritorious, defense counsel's failure to assert it would result in withdrawing a crucial defense from the case and amount to ineffective assistance of counsel. (*People v. Belcher* (1974) 11 Cal.3d 91, 96.) Thus, to determine whether defendant's trial counsel was ineffective for failing to assert double jeopardy, we must consider the issue on its merits.

"The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that no person may be tried more than once for the same offense." (*People v. Sanchez* (2020)

13

49 Cal.App.5th 961, 974 (*Sanchez*), citing *People v. Anderson* (2009) 47 Cal.4th 92, 103-104.) "The double jeopardy clause thus ' "protects against a second prosecution for the same offense following an acquittal or conviction, and also protects against multiple punishment for the same offense." ' " (*Sanchez*, at p. 974.)

"This bar generally only prevents repeated prosecution based on ' "the same identical act *and* crime." ' " (*Sanchez, supra*, 49 Cal.App.5th at p. 974, quoting *Currier v. Virginia* (2018) 585 U.S. ___ [201 L.Ed.2d 650, 660] (*Currier*).) "Thus, to prevent a second trial, the defendant generally must show an identity of statutory elements between the former and current charges against him." (*Sanchez*, at p. 974, citing *Currier*, at p. ___ [201 L.Ed.2d at p. 661] & *Blockburger v. United States* (1932) 284 U.S. 299, 304.)

"However, in narrow circumstances where two offenses involve a common issue of ultimate fact, 'the retrial of an issue can be considered tantamount to the retrial of an offense,' even if the elements of the two offenses differ." (*Sanchez, supra*, 49 Cal.App.5th at pp. 974-975, quoting *Currier, supra*, 585 U.S. at p. ___ [201 L.Ed.2d at p. 661]; see *Ashe, supra*, 397 U.S. at pp. 443-444; *Yeager v. United States* (2009) 557 U.S. 110, 119-120 (*Yeager*).) "This principle is derived from the doctrine of collateral estoppel, which provides that when 'an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' " (*Sanchez*, at p. 975, citing *Ashe*, at p. 443; accord, *Yeager*, at p. 119; *People v. Santamaria* (1994) 8 Cal.4th 903, 912 (*Santamaria*).)

"[C]ollateral estoppel bars relitigation of an issue decided at a previous trial 'if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial.' " (*People v. Lawley* (2002) 27 Cal.4th 102, 163 (*Lawley*).)

According to our high court, "[c]ollateral estoppel, which applies to relitigation of factual *issues*, is analytically distinct from double jeopardy, which applies to retrial of

14

*offenses*. Thus, collateral estoppel is conceptually separate from double jeopardy, but, under *Ashe, supra*, 397 U.S. 436, when applicable, it is a component of the double jeopardy clause of the Fifth Amendment." (*Santamaria, supra*, 8 Cal.4th at p. 912, fn. 3.) "In the criminal context, the test for establishing a bar against retrial based on collateral estoppel 'is a demanding one.' " (*Sanchez, supra*, 49 Cal.App.5th at p. 975, quoting *Currier, supra*, 585 U.S. at p. ___ [201 L.Ed.2d at p. 657].) " 'To say that the second trial is tantamount to a trial of the same offense as the first and thus forbidden by the Double Jeopardy Clause, we must be able to say that "it would have been *irrational* for the jury" in the first trial to acquit without finding in the defendant's favor on a fact essential to a conviction in the second.' " (*Sanchez*, at p. 975, quoting *Currier*, at p. ___ [201 L.Ed.2d at p. 657].) "In other words, a second trial is prohibited only if conviction would require the prosecutor to prevail on a factual issue the jury *necessarily* resolved in the defendant's favor in the first trial." (*Sanchez*, at p. 975, citing *Yeager*, at p. 123; *Currier*, at p. ___ [201 L.Ed.2d at p. 657].) "It is not sufficient that the jury *likely* acquitted based on the factual issue in question." (*Sanchez*, at p. 975, citing *Currier*, at p. ___ [201 L.Ed.2d at p. 657].)

"That said, we do not apply the 'hypertechnical and archaic approach of a 19th century pleading book.' " (*Sanchez, supra*, 49 Cal.App.5th at p. 975, quoting *Ashe, supra*, 397 U.S. at p. 444.) "Instead, we must ' "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." ' " (*Ibid.*, fn. omitted.) "In assessing which matters the jury necessarily decided, we are confined to ' "the points in controversy on the former trial, to the testimony given by the parties, and to the questions submitted to the jury for their consideration." ' " (*Sanchez*, at p. 975, quoting *Yeager, supra*, 557 U.S. at p. 122.) "We derive no import from counts on which the jury hung in the first trial." (*Sanchez*, at p. 975, quoting *Yeager*, at p. 122.)

" 'The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." ' " (*Sanchez*, at p. 975, quoting *Ashe*, at p. 444.) "Our 'ultimate focus remains on the practical identity of offenses,' i.e., whether a second trial amounts, in practical terms, to a retrial for the same offense." (*Sanchez*, at p. 975, quoting *Currier, supra*, 585 U.S. at p.___ [201 L.Ed.2d at p. 661].)

"It is the defendant who bears the burden of establishing facts to prove that a previously rendered judgment of acquittal bars retrial based on double jeopardy principles." (*Sanchez, supra*, 49 Cal.App.5th at pp. 975-976, fn. omitted.) "We review the trial court's resolution of any disputed facts for substantial evidence." (*Id*. at p. 976.) "The court's legal determination on the question of former jeopardy is a question of law that we review de novo." (*Ibid*.)

Defendant relies on both *Ashe* and *Yeager*. The facts of these cases illustrate the operation of collateral estoppel in this context, and *Yeager* is particularly relevant as to the significance of hung counts in an earlier trial.

In *Ashe*, six men were playing poker in a basement when three or four masked men, armed with a shotgun and pistols, broke in and robbed them. (*Ashe, supra*, 397 U.S. at p. 437.) The defendant went to trial for the robbery of one of the victims, Knight, and the jury acquitted him. (*Id*. at pp. 438-439.) Subsequently, the defendant was brought to trial again, this time charged with the robbery of a different victim, Roberts. (*Id*. at p. 439.) The defendant moved to dismiss based on his prior acquittal. (*Ibid*.) The motion was denied, and the defendant was convicted. (*Id*. at pp. 439-440.) Reversing the denial of the defendant's petition for a writ of habeas corpus, the high court concluded: "the record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that Knight had not been a victim of that robbery. The single rationally conceivable issue in dispute before the jury was whether the [defendant] had been one of the robbers. And the jury by its verdict found that he had not. The federal rule of law, therefore, would make a second

16

prosecution for the robbery of Roberts wholly impermissible." (*Id*. at p. 445.) The court stated that the question before it was "whether, after a jury determined by its verdict that the [defendant] was not one of the robbers, the State could constitutionally hale him before a new jury to litigate that issue again." (*Id*. at p. 446.) The high court concluded it could not. (*Ibid*.)

In *Yeager*, the defendant was tried on " 'fraud counts' " and " 'insider trading counts.' " (*Yeager, supra*, 557 U.S. at p. 114.) The jury acquitted the defendant on the fraud counts, but it failed to reach verdicts on the insider trading counts. (*Id*. at p. 115.) The government recharged the defendant with some of the insider trading counts. (*Ibid*.) The defendant moved to dismiss all counts in the new indictment "on the ground that the acquittals on the fraud counts precluded the Government from retrying him on the insider trading counts." (*Ibid*., fn. omitted.) The defendant asserted that "the jury's acquittals had necessarily decided that he did not possess material, nonpublic information" about a project relevant to both fraud counts and insider trading counts. (*Ibid*.)

In reviewing the district court's denial of the defendant's motion, the Court of Appeals "concluded that 'the jury must have found when it acquitted [the defendant] that [he] did not have any insider information that contradicted what was presented to the public.' [Citation.] The [Court of Appeals] acknowledged that this factual determination would normally preclude the Government from retrying [the defendant] for insider trading or money laundering." (*Yeager, supra*, 557 U.S. at p. 116.) The Court of Appeals "was nevertheless persuaded that a truly rational jury, having concluded that [the defendant] did not have any insider information, would have acquitted him on the insider trading counts. That the jury failed to acquit, and instead hung on those counts, was pivotal in the [Court of Appeals'] issue-preclusion analysis. Considering 'the hung counts along with the acquittals,' the [Court of Appeals] found it impossible 'to decide with any certainty what the jury necessarily determined.' " (*Ibid*.) Thus, "the [Court of

17

Appeals] concluded that the conflict between the acquittals and the hung counts barred the application of issue preclusion . . . ." (*Ibid*.)

The high court concluded that the "Court of Appeals' issue-preclusion analysis was in error. A hung count is not a 'relevant' part of the 'record of [the] prior proceeding.' " (*Yeager, supra*, 557 U.S. at p. 121.) "Because a jury speaks only through its verdict, its failure to reach a verdict cannot—by negative implication—yield a piece of information that helps put together the trial puzzle. . . . Unlike the pleadings, the jury charge, or the evidence introduced by the parties, there is no way to decipher what a hung count represents. . . . A host of reasons—sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few—could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return." (*Id*. at pp. 121-122, fns. omitted.) "To identify what a jury necessarily determined at trial, courts should scrutinize a jury's decisions, not its failures to decide." (*Id*. at p. 122.) "Thus, if the possession of insider information was a critical issue of ultimate fact in all of the charges against petitioner, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element." (*Id*. at p. 123.) However, given the factual nature of the matter at issue, the voluminous record, and the limited nature of the grant of certiorari, the high court remanded the matter for the Court of Appeals to revisit, if it chose to do so, its factual analysis as to whether the jury necessarily resolved in the defendant's favor an issue of ultimate fact that the Government had to prove in order to convict him of insider trading and money laundering. (*Id*. at pp. 125-126.)

Based on the language in *Yeager*, it is abundantly clear that counts one and three from the first trial here, the hung counts, have no place in our analysis. (*Yeager, supra*,

18

557 U.S. at pp. 121-122.) The hung counts are "not a 'relevant' part of the 'record of [the] prior proceeding.' " (*Id*. at p. 121.) To the extent defendant contends otherwise, his contention is belied by United States Supreme Court case law and meritless. Thus, we only consider from the first trial the acquittal on count two.

Count two charged, in part: "On or about and between May 15, 2014, and January 19, 2015, . . . the defendant . . . did commit a felony, namely: a <u>violation of Section 288(b)(1)</u> . . . in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act, to wit, finger inside vagina in living room, upon . . . [the victim], a child under the age of fourteen years, to wit, age 5-6 years . . . ."

Count one here corresponds to count one in the first trial, on which the jury hung. Like count one in the first trial, in count one here, defendant was charged, in part, as follows: "On or about and between May 15, 2014, and January 19, 2015, . . . the defendant . . . did commit a felony, namely: a <u>violation of Section 288(b)(1)</u> . . . in that said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act, to wit, fingers to vagina in living room, upon . . . [the victim], a child under the age of fourteen years, to wit, age 5-6 years . . . ."

In closing argument in the first trial, the prosecutor distinguished counts one and two: "Count 1 is fingers to [the victim's] vagina in the living room . . . . [¶] You will see Count 2 is different. It's fingers in her vagina. Those are two separate acts. The touching on the outside of the genital area versus fingers inside of her are two separate acts with two separate counts, and you will have a verdict form for each." The prosecutor expanded on her descriptions of these two counts. She described count one as defendant touching the victim "anywhere in her vaginal area." She further stated defendant "reached under her panties and rubbed her vagina and told her to be quiet and covered her mouth. This is Count 1, the act of rubbing her vagina." She then proceeded to address count two: "Now, Count 2 is fingers in her vagina. So the touching on the outside, and

19

then it progressed to inside. That's Count 2. [¶] So this is the same element except for fingers were inside her vagina."

The verdict forms in the first trial clarified the factual allegations relevant to counts one and two. The signed verdict form, acquitting defendant on count two, specified it pertained to violation of section 288, subdivision (b)(1), "a lewd and lascivious act (fingers inside vagina in living room), by force or fear . . . ." The unsigned verdict form on count one, one of the hung counts, specified that count pertained to violation of section 288, subdivision (b)(1), "a lewd and lascivious act (fingers to vagina in living room), by force or fear . . . ."

At most, the jury in defendant's first trial *necessarily* determined the prosecution failed to prove, beyond a reasonable doubt, defendant digitally penetrated the victim's vagina. This would preclude retrying defendant on a charge that he digitally penetrated the victim's vagina at the same time and place as in the acquitted charge. (See generally *Ashe, supra*, 397 U.S. at p. 443 [collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit"]; *Lawley, supra*, 27 Cal.4th at p. 163 [elements of collateral estoppel]; see also *Sanchez, supra*, 49 Cal.App.5th at p. 974, quoting *Currier, supra*, 585 U.S. at p. ___ [201 L.Ed.2d at p. 660] [double jeopardy generally only prevents repeated prosecution based on the same identical act and crime].)

In the acquittal on count two in the first trial, the jury did not *necessarily* determine the issue of ultimate fact as to whether defendant put his fingers to the outside of the victim's vagina at the same time and place. To acquit defendant on count two, the first jury did not *necessarily* have to determine defendant did not put his fingers to the outside of the victim's vagina. It did *necessarily* determine, for whatever reason, that the prosecution failed to prove beyond a reasonable doubt that defendant inserted his fingers into the victim's vagina in the living room during the relevant time frame. The jury may

20

have concluded, for example, that the absence of any trauma, as demonstrated by Langston's examination and report, suggested defendant did not, in fact, digitally penetrate the victim's vagina, even if he touched the outside of her vagina.

Thus, we cannot say that " ' "it would have been *irrational* for the jury" in the first trial to acquit without finding in the defendant's favor on a fact essential to a conviction in the second.' " (*Sanchez, supra*, 49 Cal.App.5th at p. 975, quoting *Currier, supra*, 585 U.S. at p. ___ [201 L.Ed.2d at p. 657].) Conviction on count one in the second trial—violation of section 288, subdivision (b)(1), "fingers to vagina in living room"— did not require the prosecutor to prevail "on a factual issue the jury *necessarily* resolved in the defendant's favor in the first trial." (*Sanchez*, at p. 975, citing *Yeager, supra*, 557 U.S. at p. 123; *Currier*, at p. ___ [201 L.Ed.2d at p. 657].)

Defendant's position is that the jury in the first trial necessarily decided an issue in his favor—the victim's credibility—that requires a finding in his favor on an issue essential to his conviction in the second trial. For example, defendant asserts the "issue in both trials was whether [the victim's] version of what happened with [defendant] on January 19th was credible. That issue was definitively resolved in [defendant's] favor in the first trial." This is an overly broad and speculative characterization of what the jury in the first trial necessarily decided.

Defendant has cited no authority for the proposition that, in circumstances such as these, a victim's credibility, even if we were able to divine the jury's conclusion on that matter, is an "issue of ultimate fact" such that it may be the subject of collateral estoppel and preclude retrial on a different but related charge. (See generally *Ashe, supra*, 397 U.S. at p. 443; *Yeager, supra*, 557 U.S. at p. 119; *Santamaria, supra*, 8 Cal.4th at p. 912.) Defendant's position is in stark contrast to, for example, *Ashe* and *Yeager*. In those cases, issues of ultimate fact were at issue—whether the defendant was one of the robbers in *Ashe* (*Ashe,* at pp. 445, 446) and the possession of insider information in *Yeager* (*Yeager, supra*, 557 U.S. at p. 123). Defendant's focus here is not on an issue of

21

ultimate fact, but rather on *the victim's credibility in her representations about the issues of ultimate fact*.

Defendant elsewhere asserts, "[t]he jury considered [the victim's] credibility and rejected it." Extended to its logical conclusion, if collateral estoppel in the double jeopardy context applied as defendant seeks to apply it here, in every instance of an acquittal, retrial on different but related charges would be precluded if they depended on the testimony of the same victim or witness involved in the acquitted charge. Indeed, defendant's position appears to be, distilled to its essence, that the first jury heard the victim testify and, by acquitting on count two and hanging on count one, demonstrated that it "did not believe her," and therefore defendant may not be retried on allegations as to what occurred on January 19. We find this position untenable and defendant cites no applicable authority supporting it.

It is entirely possible that the jury in defendant's first trial acquitted him on count two because it found the victim's testimony *specifically applicable to that count* to lack credibility. The jury's credibility determination as to that count does not *necessarily* demand a particular result as to the other counts, even assuming count one occurred at or around the same time.

Defendant also argues that, "[e]ven though the charges alleged a date range, the evidence and counsel's arguments demonstrated the allegations involved events on the morning of January 19, 2015, and events that occurred in the living room." However, defendant does not cite to the record to support this position, a considerable oversight given the fact that defendant's argument depends upon, among many other things, the acts occurring at the same time and place. The charging instruments in both trials alleged a date range, not an isolated date, as to all charges. The six-year-old victim in her outcry to Carolina and in her SAFE interview—the representations upon which the charges were largely based—did not identify particular dates of the alleged incidents. Indeed, while her accounts were inconsistent, the victim at times described ongoing abuse. Carolina

22

testified that, on January 19, 2015, when the victim reported the abuse to her, the victim told her that defendant touched her on the vagina, but that it happened "some day," "it wasn't that day." The victim told Carolina that defendant touching her "cha-cha" and making the victim touch his penis happened "[m]ore than one time." The victim told Carolina the abuse occurred over 30 to 40 days. The victim was not sure whether defendant touched her "early that day." The prosecutor's initial and rebuttal closing arguments in the second trial did not specify count one was alleged to have occurred on January 19, 2015. The prosecutor referred to the evidence indicating the abuse occurred "multiple times, multiple locations in the house." The prosecutor argued the victim "described bleeding, but was clear it wasn't that morning, but at some point she experienced some bleeding." The prosecutor described count one as "fingers to the vagina in the living room," but did not specify a date or time. In her rebuttal closing argument, the prosecutor specified, "You did hear that [the victim] said things happened multiple times, which makes sense that she wouldn't necessarily know the date, the time. You do not have to know the date or time of the two acts charged, just that the two acts that I told you during my opening remarks happened. . . . You just have to agree on the act. The prosecution does not need to show the exact dates these acts happened." Obviously, defendant's double jeopardy/collateral estoppel argument would be further undermined by the premise that count one in his second trial was not necessarily alleged to have occurred at the same time as count two in the first trial. In any event, even assuming count two in the first trial and count one in the second trial did allegedly occur in succession, as described by the prosecutor in her closing argument in the first trial, we reject defendant's contentions for the reasons stated herein.

We conclude defendant's collateral estoppel/double jeopardy argument is meritless. Accordingly, we conclude defense counsel was not ineffective for failing to raise it. (*People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines

23

would be futile"].)  Because counsel was not ineffective for failing to raise the issue, we need not address the issue of prejudice.  (*Strickland, supra*, 466 U.S. at p. 697 ["there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one"].)

Finally, we note that the jury at defendant's first trial also found defendant not guilty on count two of the lesser crime of lewd and lascivious act in violation of section 288, subdivision (a).  For the first time in his reply brief on appeal, defendant asserts the jury's determination in the first trial as to this lesser included offense also has preclusive effect as to count one in the second trial.  " '[W]e do not consider points raised for the first time in the reply brief absent a showing of good cause for the failure to present them earlier.' "  (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 630, fn. 9, quoting *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)  " 'Obvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief.  To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission.  Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' "  (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764, quoting *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8; see also *Simpson v. The Kroger Corp.* (2013) 219 Cal.App.4th 1352, 1370.)  Having shown no good reason for his failure to raise these points before, we do not reach this contention.

## II

*Denial of Motion to Continue and Evidentiary Hearing into Juror Misconduct*

The jury rendered its verdicts on July 27, 2018.  On August 22, 2018, defendant moved for a new trial and asked for an evidentiary hearing on the grounds of juror misconduct.  He asserted juror misconduct based on (1) jurors discussing the case prior to deliberations, (2) juror discussion of the fact that defendant did not testify, and (3) the foreperson's statement that the judge would not accept an 11-1 vote.

As an exhibit in support of his new trial motion, defendant submitted what purported to be a declaration by Juror No. 8, although the document was not dated.  In it, Juror No. 8 stated, in part, that, during trial, Juror No. 8 "saw and heard juror number 1 [redacted] speaking with one of the alternate jurors, [redacted].  [Redacted] stated to Ms. [redacted] something to the effect of, 'I know where he was trying to lead her,' and 'I know what he was trying to get out of her.'  This occurred in one of the stairwells in the courthouse at or around the time Brittany . . . was on the stand.  It was evident to me that [redacted] was referring to [defense counsel's] questioning of Brittany . . . on the stand.  I immediately moved away, because the discussion seemed improper to me."  The document also stated that Juror No. 5 discussed the fact that defendant did not testify.  It further stated that, for "a substantial portion of the deliberations, the jurors were 11-1 for guilt.  I was the one voting not guilty.  The foreperson said something to the effect of, 'The judge won't accept an 11-1 vote.' "

In its opposition to defendant's motion, the prosecution submitted its own juror declaration.  That juror stated, in part:  "During deliberations, Juror 5 made a very brief comment less than a minute or two of discussion, where Juror #5 [redacted] said he wished [defendant] had testified."  "Then one or two jurors said that it's his constitutional right not to testify and that we cannot consider this in deliberations."  "There was no further discussion of [defendant] testifying."

On September 12, 2018, defendant moved for a continuance. According to defendant, fundamental fairness necessitated a continuance because of the temporary unavailability of the alternate juror identified in its juror's declaration. In argument before the trial court on September 14, 2018, defense counsel stated the alternate juror was out of the country until September 22 or 23, 2018. In opposition, the prosecution asserted the defense's juror declaration was defective as it was undated. The prosecution also asserted the defense had not demonstrated due diligence in attempting to contact jurors. The prosecutor noted that the defense knew that, in addition to the alternate juror, Juror No. 1 was a party to the "stairwell conversation," and the defense therefore could have pursued the matter with Juror No. 1. In reply, the defense stated that the decision to pursue the alternate juror rather than Juror No. 1 was strategic.

The trial court denied the motion to continue, concluding the defense had not established it had exercised due diligence. The court concluded that "it would be a fishing expedition."

With regard to the new trial motion premised on juror misconduct, the court noted that the defense's juror declaration was "technically defective," presumably because it was undated, but nonetheless considered it.

With regard to the jury foreperson's remark that the judge would not accept an 11-1 verdict, the court stated this was a correct statement of law because an 11-1 vote is not a verdict but a hung jury. The court also noted the declaration did not state that the jury believed the foreperson's statement meant they had to deliberate until they reached a unanimous verdict. Thus, the court concluded that, on its face, this did not establish juror misconduct.

With regard to Juror No. 1's stairwell conversation with an alternate juror, the court concluded the statements the declaring juror overheard were vague and, on their face, they did not refer to the case. Thus, according to the court, the declaring juror was speculating about the nature of the conversation. The court further noted that the

26

statements "apparently were not significant enough at the time to raise a concern for Juror Number 8 and cause him to report it to the Court or any staff of the Court." Further, the court noted the alternate juror never deliberated. In any event, the court stated that the alleged misconduct was not serious; the statements commented on defense counsel's questioning and what he was doing, not the evidence. The court determined these remarks were not prejudicial.

Finally, as to remarks about the fact that defendant did not testify, the court stated that the presumptively prejudicial nature of such remarks was rebutted by Juror No. 6's declaration, which noted that the jurors were reminded they were not to consider the defendant's choice, guaranteed under the Constitution, not to testify.

Thus, the trial court declined to hold an evidentiary hearing and denied defendant's new trial motion premised on juror misconduct.

On appeal, defendant asserts the trial court abused its discretion in denying his motion for a continuance and in failing to conduct an evidentiary hearing to investigate colorable claims of juror misconduct.

Denial of Defendant's Motion for a Continuance

Defendant asserts the trial court erroneously concluded the defense had not exercised due diligence. Defendant emphasizes that defense counsel "informed the court that for strategic reasons and based on what he learned from other jurors, counsel wanted to contact the alternate [juror], not Juror No. 1."

"Continuances in criminal cases are to be granted only for good cause, and the trial court's denial of a continuance is reviewed for abuse of discretion only." (*People v. Rhoades* (2019) 8 Cal.5th 393, 451 (*Rhoades*).)

The continuance defendant sought appeared to relate only to the stairwell conversation, not Juror No. 5's discussion of the fact defendant did not testify or the foreperson's remark that the judge would not accept an 11-1 vote.

27

Based on Juror No. 8's declaration, Juror No. 1 and an alternate juror had a conversation in a courthouse stairwell, the substance of which we will address further *post*. Defendant claimed the need for a continuance to speak with the alternate juror about the conversation. Obviously, Juror No. 1 being the other participant in the conversation, the defense certainly could have spoken to that juror about it. Defendant asserts that, for strategic reasons, he wanted to speak with the alternate juror rather than Juror No. 1. According to defendant, that "made objective sense. To the extent misconduct occurred, the greater responsibility was with Juror No. 1 who was therefore less likely to be forthcoming about having committed misconduct."

While defendant's preference was to speak to the alternate juror, that approach was not the only way to gather additional information about the conversation. Despite defendant's preference, quite obviously, upon learning the alternate juror was out of the country, he could have spoken with Juror No. 1. Moreover, nothing prevented defendant from speaking to Juror No. 1 first, while the alternate juror was out of the country, adding information gleaned from that conversation to his request for a continuance, if warranted. Instead, defendant did nothing other than await the alternate juror's return. While defendant touts the strategic rationale for his choice, he does not offer any support for the suggestion that speaking with Juror No. 1 would somehow taint the alternate juror.

Based on these circumstances, we agree with the trial court that defendant failed to establish due diligence. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1171 (*Howard*), disapproved on another ground in *Rhoades, supra*, 8 Cal.5th at p. 425, fn. 12 [to establish good cause for a continuance during trial, "defendant had the burden of showing that he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven"].) We further conclude defendant did not establish the

28

alternate juror's testimony would not have been cumulative or "that the facts to which the witness would testify could not otherwise be proven." (*Howard*, at p. 1171.)

On this record, we cannot conclude the trial court abused its discretion in denying defendant's motion for a continuance. (See generally *Rhoades, supra*, 8 Cal.5th at p. 451.)

Denial of Request for Evidentiary Hearing into Juror Misconduct

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

The statutory grounds pursuant to which a trial court is authorized to grant a new trial are set forth in section 1181. Juror misconduct is among the grounds on which a defendant may move for a new trial. (§ 1181, subd. (3).)

" ' "When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. [Citation.] If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial." ' " (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1042 (*Vallejo*).)

Misconduct by a juror usually raises a rebuttable " 'presumption' of prejudice." (*In re Hamilton, supra*, 20 Cal.4th at p. 295.) "Still, whether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' [Citations.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e.,

no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Id*. at p. 296.)

When jury misconduct is alleged, a trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415, 419 (*Hedgecock*).) However, a "defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Id*. at p. 415.) "[I]t is within the discretion of a trial court to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. This does not mean, however, that a trial court must hold an evidentiary hearing in every instance of alleged jury misconduct. The hearing should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*Id*. at p. 419, fn. omitted.) The "trial court's decision whether to conduct an evidentiary hearing on the issue of juror misconduct will be reversed only if the defendant can demonstrate an abuse of discretion." (*People v. Dykes* (2009) 46 Cal.4th 731, 810 (*Dykes*).)

The Attorney General asserts Juror No. 8's declaration was neither a sworn affidavit nor a declaration satisfying Code of Civil Procedure section 2015.5 because, as defendant acknowledges, it was not dated. Therefore, according to the Attorney General, defendant failed to satisfy the first requirement of establishing his entitlement to a new trial based on jury misconduct, that the declaration supporting the motion was admissible. (See *Vallejo, supra*, 214 Cal.App.4th at p. 1042.)

30

Code of Civil Procedure section 2015.5 provides, in part, "Whenever, under any law of this state or under any rule, regulation, order or requirement made pursuant to the law of this state, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn statement, declaration, verification, certificate, oath, or affidavit, in writing of the person making the same . . . , such matter may with like force and effect be supported, evidenced, established or proved by the unsworn statement, declaration, verification, or certificate, in writing of such person which recites that it is certified or declared by him or her to be true under penalty of perjury, is subscribed by him or her, and (1), if executed within this state, states the date and place of execution, or (2), if executed at any place, within or without this state, states the date of execution and that it is so certified or declared under the laws of the State of California."

The juror declaration is, indeed, not dated, and thus does not comply with the requirements of Code of Civil Procedure section 2015.5. As such, the declaration supporting defendant's new trial motion would not be admissible as required under the first step of our inquiry. (See *People v. Avila* (2006) 38 Cal.4th 491, 605 [noting, among other issues with declarations, that one of them was undated, but not disposing of the matter on this basis alone]; see generally *Vallejo*, *supra*, 214 Cal.App.4th at p. 1042.)

In any event, even considering the undated declaration, we conclude that, on the merits, the trial court did not abuse its discretion in declining to hold an evidentiary hearing into defendant's claims of juror misconduct.

### Pre-deliberation Discussion Between Juror No. 1 and an Alternate Juror

"Jurors are prohibited by law from discussing the case until all the evidence has been presented, the trial court instructs the jury, and the jury has retired to deliberate. [Penal Code] [s]ection 1122, subdivision (a) provides in pertinent part that '[a]fter the jury has been sworn and before the people's opening address, the court shall instruct the

31

jury generally concerning its basic functions, duties, and conduct. The instructions shall include, among other matters, admonitions that the jurors shall not converse among themselves, or with anyone else, on any subject connected with the trial.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 838 (*Wilson*).) "The issue sometimes arises after a verdict has been rendered, when a criminal defendant attempts to undermine the validity of the verdict by claiming a juror violated the court's admonition not to speak to anyone connected with the case. In such circumstances, we have held that trivial violations of this rule do not require reversal because no prejudice to the defendant resulted." (*Id.* at p. 839.)

In the declaration, Juror No. 8 stated, in part, that, during trial, Juror No. 8 "saw and heard juror number 1 [redacted] speaking with one of the alternate jurors, [redacted]. [Redacted] stated to Ms. [redacted] something to the effect of, 'I know where he was trying to lead her,' and 'I know what he was trying to get out of her.' This occurred in one of the stairwells in the courthouse at or around the time Brittany . . . was on the stand. It was evident to me that [redacted] was referring to [defense counsel's] questioning of Brittany . . . on the stand. I immediately moved away, because the discussion seemed improper to me."

As the trial court concluded, the declaration, on its face, does not establish this conversation was about the case at all. Absent anything more specific than what is set forth in the declaration, Juror No. 8's conclusions that it was "evident" the conversation pertained to defense counsel's questioning of Brittany and that the conversation "seemed improper" is pure speculation. Thus, the declaration does not establish a trivial, nonprejudicial violation of the rule barring pre-deliberation discussion of the case which would nevertheless not require reversal; the declaration does not establish a violation of this rule at all. (*Wilson, supra*, 44 Cal.4th at p. 839.) " '[W]hen jurors are observed to be talking among themselves it will not be presumed that the act involves impropriety, but in order to predicate misconduct of the fact it must be made to appear that the conversation

32

had improper reference to the evidence, or the merits of the case.' " (*People v. Majors* (1998) 18 Cal.4th 385, 425, quoting *People v. Kramer* (1897) 117 Cal. 647, 649.) "Even then, unless it be shown to have been of a character calculated to prejudice the defendant, it is not sufficient to work a reversal." (*Kramer*, at p. 649.) Again, here, we will not assume the conversation overheard by Juror No. 8 involved the case based only on Juror No. 8's speculation to that effect.

Juror No. 8's declaration did not constitute evidence of juror misconduct. Defendant did not demonstrate a "strong possibility that prejudicial misconduct . . . occurred." (*Hedgecock, supra*, 51 Cal.3d at p. 419.) Juror No. 8's declaration did not give rise to the existence of any material disputed issue of fact that could only be resolved at an evidentiary hearing. Rather, an evidentiary hearing on the matter would amount to no more than a " 'fishing expedition' to search for possible misconduct . . . ." (*Ibid*.) Therefore, the trial court did not abuse its discretion in declining to hold an evidentiary hearing on the matter. (*Id*. at pp. 415, 419.)

### Discussion of Defendant's Choice Not to Testify

In the declaration, Juror No. 8 stated: "During deliberations, juror number 5 [redacted] discussed the fact that [defendant] did not testify." In the juror declaration proffered by the prosecution in opposition, the juror stated: "During deliberations, Juror 5 made a very brief comment less than a minute or two of discussion, where Juror #5 [redacted] said he wished [defendant] had testified." "Then one or two jurors said that it's his constitutional right not to testify and that we cannot consider this in deliberations." "There was no further discussion of [defendant] testifying."

Violating the trial court's instruction not to discuss a defendant's failure to testify constitutes juror misconduct. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425 (*Leonard*).) Based on both juror declarations, Juror No. 5 committed misconduct, as that juror discussed the defendant's failure to testify. (*Ibid*.) "This misconduct gives rise to a

presumption of prejudice, which 'may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' " (*Ibid*.)

An evidentiary hearing "should be held only when the defense has come forward with evidence demonstrating a strong possibility that *prejudicial* misconduct has occurred." (*Hedgecock, supra*, 51 Cal.3d at p. 419, italics added.) As we shall discuss, we conclude that the presumption of prejudice was rebutted, and, accordingly, defendant has not demonstrated a strong possibility that *prejudicial* misconduct occurred. (*Ibid*.)

"[A] reminder to the jury of the court's instructions to disregard a defendant's decision not to testify is, in the absence of objective evidence establishing a basis to question the effectiveness of the reminder [citation], strong evidence that prejudice does not exist." (*People v. Lavender* (2014) 60 Cal.4th 679, 687 (*Lavender*).) Here, according to the juror declaration submitted by the prosecution, after Juror No. 5 remarked that he wished defendant had testified, "one or two jurors said that it's his constitutional right not to testify and that we cannot consider this in deliberations." "There was no further discussion of [defendant] testifying." Thus, Juror No. 5, and the jury overall, were reminded of the court's instructions to disregard defendant's decision not to testify. (*Ibid*.) Additionally, there is no "objective evidence establishing a basis to question the effectiveness of the reminder . . . ." (*Ibid*.) Thus, this is strong evidence no prejudice exists here. (*Ibid*.) Moreover, nothing else in the record gives rise to any suggestion of prejudice.

In *People v. Hord* (1993) 15 Cal.App.4th 711 (*Hord*) " 'several jurors discussed why the defendant did not take the stand and testify.' " (*Id*. at p. 721.) The foreperson declared: " 'I . . . interrupted and informed the jury that whether the defendant testified or not had no bearing on his guilt or innocence. This was not to be used in our decision making process. Any further discussion or talk whatsoever regarding testimony of the defendant was stopped.' " (*Id*. at p. 722.) The *Hord* court noted that, "[b]ecause the truth

34

of the material allegations [in the jurors' affidavits] was not in question, the trial court did not abuse its discretion in denying defendant's motion for a *Hedgecock* hearing." (*Id*. at p. 724.) The court next concluded that discussion of the fact that the defendant did not testify constituted misconduct. (*Id*. at p. 725.) Turning to prejudice, the court noted that there was "no indication in the declarations presented to the trial court here 'of any open discussion or agreement among the jurors evidencing a deliberate refusal to follow the court's instructions.' " (*Id*. at p. 726.) The court further noted that the inappropriate "discussion was very different than when a juror performs experiments or brings in new law or facts into deliberations. The jury was obviously well aware here that defendant did not testify . . . . Thus the comments did not interject any new material into deliberations that was not already known by the jury from the trial itself. Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion." (*Id*. at pp. 727-728.) The court also stated: "When comments go beyond natural curiosity and their content suggests inferences from forbidden areas, the chance of prejudice increases. For example, if a juror were to say, 'The defendant didn't testify so he is guilty,' . . . , the comments go beyond mere curiosity and lean more toward a juror's drawing inappropriate inferences from areas which are off limits. Such comments are more likely to influence that juror and other jurors." (*Id*. at p. 728.) The court concluded that "forbidden elements inadvertently crept into jury discussions. However, there is no substantial likelihood that defendant suffered actual harm." (*Ibid*.)

In *Leonard, supra*, 40 Cal.4th 1370, during the penalty phase of the defendant's trial, several jurors expressed their wish that the defendant had testified. (*Id*. at p. 1424.) Citing *Hord*, our high court concluded that these remarks did constitute juror misconduct. (*Id*. at p. 1425.) However, the court further concluded defendant was not prejudiced as a result. (*Ibid*.) Our high court noted that, in their remarks, the jurors "merely expressed regret that defendant had not testified, because such testimony might have assisted the

35

jurors in understanding him better." (*Ibid.*) Quoting the trial court, our high court continued: " 'I think that wanting to hear defendants testify is natural. We do the best we can to deter jurors from speculating and from drawing negative inferences, but merely referencing that they wish he would have testified is not the same as punishing the Defendant for not testifying. It is not the same as drawing negative inferences from the absence of testimony.' " (*Ibid*.) Our high court concluded there was no substantial likelihood the defendant was prejudiced by the jury's "brief discussion of his failure to testify at the penalty phase." (*Ibid*.)

We likewise conclude here that there is no substantial likelihood defendant suffered prejudice based on Juror No. 5's remarks that he wished defendant testified. (See generally *In re Hamilton, supra*, 20 Cal.4th at p. 296 [discussing prejudice and the substantial likelihood test].) Juror No. 5's remarks amount to "comments of wonderment and curiosity," which, although misconduct, were "innocuous, particularly when [the] comment[s] stand[] alone without any further discussion." (*Hord, supra*, 15 Cal.App.4th at pp. 727-728.) The presumption of prejudice was rebutted by the other jurors' statements that it was defendant's constitutional right not to testify, that this choice cannot be considered in deliberations, and by the fact that there was no further discussion of the fact that defendant did not testify—"strong evidence that prejudice does not exist." (*Lavender, supra*, 60 Cal.4th at p. 687.) The entire record, including the nature of the misconduct and the surrounding circumstances, indicates there is "no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*In re Hamilton*, at p. 296.) We conclude there was no substantial likelihood defendant was prejudiced by Juror No. 5's "brief discussion of [defendant's] failure to testify . . . ." (*Leonard, supra*, 40 Cal.4th at p. 1425.) As a result, the defense did not "come forward with evidence demonstrating a strong possibility that *prejudicial* misconduct has occurred." (*Hedgecock, supra*, 51 Cal.3d at p. 419, italics added.)

We further conclude that, between the two juror declarations, there is not a material conflict that could only be resolved at an evidentiary hearing. (*Hedgecock, supra*, 51 Cal.3d at p. 419.) The prosecution's juror declaration agreed Juror No. 5 made the statement but added additional context including that one or two jurors said that it was defendant's constitutional right not to testify, that the jurors could not consider in deliberations defendant's choice not to testify, and that there was no further discussion of the matter. These declarations did not give rise to "material, disputed issues of fact." (*Id.* at p. 415.)

We conclude the trial court did not abuse its discretion in declining to hold an evidentiary hearing into this allegation of juror misconduct. (See generally *Dykes, supra*, 46 Cal.4th at p. 810; *Hedgecock, supra*, 51 Cal.3d at pp. 415, 419.)

<u>Foreperson's</u> <u>Statement</u> <u>that</u> <u>Judge</u> <u>Would</u> <u>Not</u> <u>Accept</u> <u>11-1</u> <u>Vote</u>

Juror's No. 8's declaration further stated: "For a substantial portion of the deliberations, the jurors were 11-1 for guilt. I was the one voting not guilty. The foreperson said something to the effect of, 'The judge won't accept an 11-1 vote.'" In substance as to this issue, defendant only asserts, citing CALCRIM No. 3550, that the "foreperson's assertion revealed a misunderstanding of juror's duties: to vote after discussing the case and reaching an individual opinion."

Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." "This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of

37

the individual juror, which can be neither corroborated nor disproved . . . .' [Citation.] 'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1261.)

To the extent defendant sought to prove by Juror No. 8's declaration "the subjective reasoning processes of the individual juror," the declaration was inadmissible on this point and not to be considered. (*Steele, supra*, 27 Cal.4th at p. 1261; see Evid. Code, § 1150.)

To the extent this portion of the declaration was proffered to prove "overt acts, objectively ascertainable" (*Steele, supra*, 27 Cal.4th at p. 1261), the court stated the foreperson's remark was a correct statement of law because an 11-1 vote is not a verdict but a hung jury. This might be more persuasive had Juror No. 8 quoted the foreperson as stating that the judge "won't accept an 11-1 verdict." An 11-1 vote would not be a "verdict" the court would accept because a verdict in a criminal case must be unanimous. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) However, a court may ultimately accept an 11-1 "vote" if the court determines the jury is hopelessly deadlocked.

Assuming, without deciding, this remark constituted juror misconduct, we conclude any presumption of prejudice was rebutted. Therefore, defendant has not demonstrated a strong possibility that *prejudicial* misconduct occurred. (*Hedgecock, supra*, 51 Cal.3d at p. 419.)

The trial court instructed the jury with CALCRIM No. 3550, in part, as follows: "It is your duty to talk with one another and to deliberate in the jury room. You should try to agree on a verdict if you can. *Each of you must decide the case for yourself*, but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. *But do not change your*

38

*mind just because other jurors disagree with you.*"  (Italics added.)  "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so."  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

Jury deliberations began on the afternoon of July 25, 2018.  The jury deliberated throughout the day on July 26 and reached a verdict on both counts on the afternoon of July 27, 2018.

During deliberations, the jury did submit notes to the court.  One requested a readback of testimony by an investigator for the district attorney's office who had testified about speaking with the victim about her SAFE interview and about the victim's subsequent first-trial testimony that she did not remember relevant events.  The jury submitted another note requesting readback of specified portions of Brittany's cross-examination.  However, before the court provided Brittany's testimony to the jury, the jury notified the court it had reached a verdict.

There was no deadlock reported to the court.

Nothing in Juror No. 8's declaration suggested she was in any way affected or influenced by the foreperson's innocuous remark that the jury could not submit an 11-1 vote to the judge.  The remark could merely have been a reminder of the jurors' ongoing duty to deliberate.

The entire record, including the nature of the misconduct, and the surrounding circumstances, demonstrates there is no reasonable probability of prejudice.  In other words, there is no substantial likelihood defendant suffered prejudice based on this instance of alleged misconduct.  (See *Leonard, supra*, 40 Cal.4th at p. 1425; see generally *In re Hamilton, supra*, 20 Cal.4th at p. 296.)  Therefore, the defense did not "come forward with evidence demonstrating a strong possibility that *prejudicial* misconduct has occurred."  (*Hedgecock, supra*, 51 Cal.3d at p. 419, italics added.)

39

Further, there is not a material conflict that could only be resolved at an evidentiary hearing. (*Hedgecock, supra*, 51 Cal.3d at p. 419.) The defense's juror declaration stated the foreperson made the challenged remark. The prosecution's declaration did not address the remark at all, and certainly did not dispute that it was made or its substance. Thus, there were no "material, disputed issues of fact" that could only be resolved at an evidentiary hearing. (*Id*. at p. 415.)

We conclude the trial court did not abuse its discretion in declining to hold an evidentiary hearing into this allegation of juror misconduct. (See generally *Dykes, supra*, 46 Cal.4th at p. 810; *Hedgecock, supra*, 51 Cal.3d at pp. 415, 419.)

<u>The</u> <u>Need</u> <u>for</u> <u>Further</u> <u>Inquiry</u> <u>into</u> <u>Extent</u> <u>of</u> <u>Misconduct</u>

Finally, for the premise that further inquiry was needed here, defendant relies on *People v. Hem* (2019) 31 Cal.App.5th 218 (*Hem*). The misconduct at issue in *Hem* is more akin to that alleged to have occurred in the stairway conversation—jurors were discussing the case outside of the presence of other jurors. Obviously, we have concluded *ante* there was no evidence of this type of misconduct here.

In any event, in *Hem*, defense counsel reported that an attorney she knew reported overhearing four jurors discussing the case: " 'She said that they were discussing the case outside of the presence of all of the jurors and outside the jury deliberation room. She heard them talk about a second, they talked about how there was one holdout on the second. They mentioned unconscious, they said that they were worried about letting him out so he could kill someone else's kid, but that they could otherwise live with the manslaughter if the answer from the court is yes. That was an answer I believe to the previous note they sent in regarding whether it was automatically a manslaughter if—I believe the note was if it's a second degree murder, is it automatically manslaughter.' " (*Hem, supra*, 31 Cal.App.5th at p. 222.) Another panel of this court noted that the overheard conversation "suggested much more than a passing comment concerning

40

deliberations," and stated that, "[t]herefore, as defense counsel urged, an inquiry was necessary to find out exactly how far the transgressions extended." (*Id*. at p. 226.) Based on the circumstances of the jurors' improper conversation, this court stated, "[i]t was quite likely, not just theoretically possible, that at least these four jurors were discussing what amounted to a compromise verdict in order to assuage a holdout's concerns. This demanded an inquiry—albeit a careful one, respecting the jurors' deliberative processes." (*Id*. at pp. 226-227.) After quoting language from *Hedgecock, supra*, 51 Cal.3d at page 419, this court stated, "In this case the defense *had* 'come forward with evidence' that misconduct had occurred and that evidence *was not disputed*. Although *Hedgecock* also cautioned that a hearing was not necessary absent a 'material conflict' that otherwise could not be resolved, in this case what was unknown was the *extent* of the misconduct. Exploring that question would not have been a 'fishing expedition,' but would have been a necessary step to preserve defendant's right to a fair jury trial." (*Hem*, at p. 227.)

Here, unlike *Hem*, the contours and extent of what was misconduct (a juror stating he wished defendant had testified) and what, for present purposes, we assume was misconduct (stating the judge would not accept an 11-1 vote) was clear and not the subject of any genuine factual dispute beyond pure speculation that more may have been said. Juror No. 8's declaration does not suggest a greater extent to these instances beyond what is contained in the declaration. Nor does the juror declaration submitted by the prosecution.

The rationale demanding further inquiry in *Hem* is not present here. We conclude the trial court did not abuse its discretion in declining to hold an evidentiary hearing into defendant's allegations of juror misconduct. (See generally *Dykes, supra*, 46 Cal.4th at p. 810; *Hedgecock, supra*, 51 Cal.3d at pp. 415, 419.)

III

*Senate Bill 567*

While this appeal was pending, the Governor signed Senate Bill 567 which made changes affecting trial courts' sentencing discretion.  In supplemental briefing, defendant asserts that Senate Bill 567, which became effective January 1, 2022, applies retroactively to his case and that the matter must be remanded for resentencing.

Generally, a penal statute does not apply retroactively unless the legislation expressly states its retroactive effect.  (§ 3.)  There is an exception to this general rule for statutes reducing criminal punishment which, absent a legislative statement to the contrary, apply retroactively to all cases that were not final when the legislation took effect.  (See *In re Estrada* (1965) 63 Cal.2d 740, 744.)  Under *Estrada*, "when the Legislature enacts a law ameliorating punishment without including an express savings clause or a similar indicator of its intent to apply the law prospectively only, we infer an intent 'that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.'  [Citation.]  In this category we included cases in which the criminal act was committed before the statute's passage, so long as the judgment is not yet final.  [Citation.]  Thus, under *Estrada*, ' "[A]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date" [citation], unless the enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent." ' " (*People v. Lara* (2019) 6 Cal.5th 1128, 1134, quoting *Estrada*, at p. 745 & *People v. DeHoyos* (2018) 4 Cal.5th 594, 603.)  Nothing in Senate Bill 567 suggests a legislative intent that the amendments apply prospectively only.  Defendant and the Attorney General agree, as do we, that Senate Bill 567 applies retroactively to defendant's case.

42

Turning to the merits, among other things, Senate Bill 567 generally limits the trial court's ability to impose the upper term sentence unless aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or by the court in a court trial.  (§ 1170, subd. (b)(1), (2), added by Stats. 2021, ch. 731, § 1.3.)  An exception to this general rule is evidence of the defendant's prior convictions established by certified records of conviction, which need not be submitted to a jury. (§ 1170, subd. (b)(3), added by Stats. 2021, ch. 731, § 1.3.)

Here, the record does not establish that any aggravating circumstance supporting the upper term sentences was stipulated to by defendant or found true beyond a reasonable doubt by the jury.  (See § 1170, subd. (b)(2).)  Additionally, defendant had no prior criminal record and thus upper term sentences could not be supported by evidence of prior convictions established by certified records of conviction.  (§ 1170, subd. (b)(3).)

The Attorney General asserts that the "error" in sentencing defendant to upper term sentences in a manner not in conformity with the provisions enacted by Senate Bill 567 was harmless beyond a reasonable doubt.  The Attorney General invokes the standard for "*Cunningham* error" (*Cunningham v. California* (2007) 549 U.S. 270) as applied in *People v. Sandoval* (2007) 41 Cal.4th 825.  (*Sandoval*, at p. 839 ["if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless"]; see *People v. Flores* (2022) 75 Cal.App.5th 495, 500 [applying this standard to Senate Bill 567 error].)  According to the Attorney General, "there was undisputed evidence of each of the . . . aggravating circumstances that the trial court relied on to impose the upper terms."  Therefore, according to the Attorney General, "remand is unnecessary because the jury would have found all of the aggravating circumstances to be true beyond a reasonable doubt."

The Attorney General has not persuaded us that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, or that the trial court properly would have arrived at the same sentencing determinations in accordance with section 1170 as amended by Senate Bill 567. We do not agree with the Attorney General that the error in not sentencing defendant in conformity with the provisions enacted by Senate Bill 567 is harmless beyond a reasonable doubt. Accordingly, we must remand the matter for resentencing.

Our determination and disposition render moot defendant's remaining contentions, raised in his original briefing, addressed to the trial court's imposition of upper term sentences based on its findings as to circumstances in aggravation (Issue III) and his claims premised on *People v. Dueñas, supra*, 30 Cal.App.5th 1175, concerning the trial court's imposition of fines, fees, and assessments at sentencing without conducting an ability-to-pay hearing (Issue IV).

### DISPOSITION

The sentence is vacated and the matter is remanded for resentencing in compliance with section 1170 as amended by Senate Bill 567. The judgment is otherwise affirmed.

HULL, Acting P. J.

We concur:

DUARTE, J.

HOCH, J.

44